Meriel L. Darzen, OSB # 113645
(503) 525-2725 │ meriel@crag.org
Kelsey Dunn, OSB # 244709
(503) 234-0788│ kelsey@crag.org
CRAG LAW CENTER
3141 E. Burnside St.
Portland, Oregon 97214
Fax: (503) 296-5454

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

### MEDFORD DIVISION

| | |
|---|---|
| **APPLEGATE SISKIYOU ALLIANCE and KLAMATH FOREST ALLIANCE,** | Case No. 1:26-cv-00409 |
| Plaintiffs, | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| v. | |
| **UNITED STATES BUREAU OF LAND MANAGEMENT,** | (Environmental Matters – Violations of Federal Land Policy and Management Act; National Environmental Policy Act; Administrative Procedure Act) |
| Defendant. | |

## NATURE OF ACTION

1.      Plaintiffs Applegate Siskiyou Alliance and Klamath Forest Alliance (collectively "Plaintiffs") bring this civil action for declaratory and injunctive relief pursuant to the Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. §§ 1701 *et seq*., the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4370, and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706.

2.      In September 2025, BLM issued the Final Environmental Assessment ("EA") and Finding of No Significant Impact ("FONSI") for the Ashland 2025 Strategic Operations for Safety ("Ashland SOS") project. BLM has issued four Decision Records ("DRs") authorizing logging activities pursuant to the Ashland SOS EA: Chopper Styx, Holcomb Hollow, Apple Saws, and Tom Bone. At least two of these Decision Records are being actively implemented through at least one or more timber sales to private timber contractors.

3.      The Ashland SOS Project EA, FONSI and DRs characterized several limiting features of how the project will be on implemented on the ground, including that hardwoods trees would be maintained, riparian buffers would be subject to only limited cutting, and roads would be constructed as represented in the project documents. BLM is now implementing the Project in a materially different manner which has different and unanalyzed effects. Plaintiffs have repeatedly requested that BLM either stop implementing these material changes or conduct additional NEPA analysis before implementing them. BLM has refused. These material changes contradict the entire purported purpose of the project, and are doing lasting damage to the public forest lands in the Applegate River watershed. These actions are representative of a pattern and practice of allowing unlawful and unanalyzed logging and roadbuilding to occur on BLM lands in the Medford area that has not ceased despite numerous complaints from members of the public.

COMPLAINT—2

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

4.      In addition, throughout the SOS documents, the BLM failed to adequately demonstrate how the Project, even as originally approved, is consistent with the applicable requirements of the Southwestern Oregon Resource Management Plan governing activities on these lands. Specifically, the SOS Project contemplates logging in Late Successional Reserves but BLM has failed to demonstrate how the approved logging will comply with RMP standards that protect future nesting, roosting and foraging habitat for ESA-listed Northern Spotted Owls.

5.      This action seeks: 1) a declaration that BLM violated FLPMA by authorizing actions that are inconsistent with the applicable Resource Management Plan; 2) a declaration that BLM violated NEPA by failing  to take a hard look and failing to supplement the NEPA analysis for the SOS Project to account for new information and changed circumstances and/or a declaration that BLM failed to complete the NEPA for the major federal actions occurring in the Project area; 3) a permanent injunction prohibiting BLM from implementing the Ashland SOS DRs or issuing additional DRs until such time as it complies with the law; and 4) the vacatur of the Ashland SOS EA and associated DRs and remand to BLM for compliance with NEPA and FLPMA.

6.      The requested relief is necessary to preserve the status quo, to prevent unlawful agency action, and to forestall irreparable injury to the environment.

7.      Should Plaintiffs prevail, Plaintiffs will seek attorneys' fees and costs pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412, and/or any other applicable authorities.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims present a federal question. A present, actual, and justiciable controversy exists between the parties. The requested relief for a declaratory judgment is proper under 28 U.S.C. § 2201, and the requested injunctive relief is proper under 28 U.S.C. § 2202.

COMPLAINT—3

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

9.      Plaintiffs have exhausted their administrative remedies by timely participating throughout the agency's SOS Project planning process, timber sale process, and/or exhaustion is not required. The challenged agency action is subject to this Court's review under 5 U.S.C. §§ 702, 704, and 706. Defendant has waived sovereign immunity in this action pursuant to 5 U.S.C. § 702.

10.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the Project area is located within this judicial district. Defendant maintains an office in this judicial district.

11.      This case is properly filed in the Medford Division pursuant to Local Rule 3-2 because the vast majority of the Project Area is located within Jackson County, and Defendant's office where the decision was signed is located in Jackson County. The events and omissions giving rise to this claim occurred, and the property that is subject to this action are primarily situated in the Medford Division.

## **PARTIES**

**Plaintiffs**

12.      Plaintiff APPLEGATE SISKYOU ALLIANCE ("ASA") is a non-profit community and conservation organization based in the Applegate Valley of southwestern Oregon. ASA, formerly known as Applegate Neighborhood Network, works to protect the scenic and biological values of the Applegate River watershed and its surrounding public lands, including areas of land within the Ashland SOS Project area. To advance its goals, ASA engages in a variety of activities, including holding educational seminars, monitoring timber sales and tracking BLM activities in the region, and supporting local residents as they engage in the public involvement process for federal land management planning. ASA has many members and supporters that live, recreate, and work in or near the Ashland SOS Project area.

COMPLAINT—4

13.    Plaintiff KLAMATH FOREST ALLIANCE ("KFA") is a 501(c)(3) non-profit conservation organization incorporated in the State of California and based in Arcata, California. KFA works in the public interest with the mission to promote sustainable ecosystems and sustainable communities. KFA was founded in 1989 by residents of the Klamath and Salmon River watersheds and represents over 500 members and supporters. KFA participates in forest planning through agency engagement, substantive comments, and collaboration with the goal of protecting and restoring the biodiversity, fisheries, wildlife, mature forests, and public lands of the Klamath-Siskiyou Mountain region, including the Medford District of the BLM.

14.    Plaintiffs have organizational interests in the proper and lawful management of the public lands managed by the Medford District BLM. Plaintiffs have actively participated in the Project's administrative process by reviewing BLM proposals and documents, conducting field exams, and submitting timely written comments regarding proposed BLM management activities.

15.    Plaintiffs and their staff and members have visited the proposed logging units and surrounding BLM lands hundreds of times over the last 30 years, including for previously proposed projects, such as the Apple Seed Project in 1999, the Pilot Joe Project in 2010, the Middle Applegate Project in 2018, and others. Additionally, the Applegate Siskiyou Alliance built and maintains the Tallowbox Trail, a non-motorized trail. This hiking trail is accessible by the BLM's Ben Johnson Road, which also provides access to the Apple Saws Timber Sale. The upper trailhead off the Ben Johnson Access Road is inaccessible during logging operations.

16.    Plaintiffs' members live and recreate in the vicinity of the Project and have a specific interest in the Applegate Valley area including those lands on Thompson Creek, on Sterling Creek and in the areas surrounding Ruch, Oregon. This area includes the world-class paragliding launch pads on Woodrat Mountain and the extremely popular, community built East

COMPLAINT—5

Applegate Ridge Trail surrounded by the Holcomb Hollow Timber Sale. The Project area and its vicinity also includes the eastern face of Ben Johnson Mountain above Cantrall-Buckley County Park in the Apple Saws Timber Sale, and the mountains above Thompson Creek where local residents and visitors enjoy dispersed recreation. The area also includes or is in the vicinity of the proposed extension of the Applegate Ridge Trail (known as the Center Applegate Ridge Trail) and the locally revered Wellington Wildlands, an over 7,000 acre wildland at the heart of the Applegate Valley that overlaps with portions of the Chopper Styx Timber Sale and has become a focal point for the local community.

17.     Plaintiffs' members have a longstanding interest in protecting these special places, and either adjoin these areas at their residential properties, recreate in them regularly, or enjoy these mountains and forests as the viewshed from their homes. Plaintiffs' members have a strong interest in the public lands that surround their homes in the Applegate Valley and their responsible management. Plaintiffs' members also have a strong interest in the wildlife and wildlife habitat in the Project Area. These interests are longstanding, particularized, not replicable, and core to their organizational missions.

18.     Plaintiffs and their members, supporters, and staff would sustain injury to their aesthetic, educational, recreational, spiritual, and scientific interests if the SOS Project proceeds both as authorized and as implemented. Plaintiffs and their members, supporters, and staff have concrete plans to return to the area where the sales are located and are being implemented. In fact, many live on private lands either adjacent to or looking out over these public lands and enjoy them on a daily basis. Unless this Court grants the requested relief, Plaintiffs and their members, supporters, and staff will be adversely and irreparably harmed by the logging and roadbuilding in the Ashland SOS Project Area.

COMPLAINT—6

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

**Defendant**

19.      Defendant UNITED STATES BUREAU OF LAND MANAGEMENT ("BLM")
is an agency within the United States Department of the Interior and is charged with managing
public lands and resources in accordance and compliance with federal laws and regulations. The
Medford District of the BLM issued the Ashland SOS EA and associated FONSI and DRs.

## LEGAL BACKGROUND

**Administrative Procedure Act (APA)**

20.      The APA confers a right of judicial review on any person adversely affected by
agency action within the meaning of a relevant statute. 5 U.S.C. § 702. Agency action made
reviewable by statute and final agency action for which there is no other adequate remedy in
court are subject to judicial review. 5 U.S.C. § 704.

21.      Upon review under the APA, a court shall "compel action unlawfully withheld or
unreasonably delayed", and/or "hold unlawful and set aside agency action * * * found to be
arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law * * *,"
5 U.S.C. § 706 (1), (2). Furthermore, when an agency has acted without observance of the
procedure required by law, that action will be set aside. 5 U.S.C. § 706(2)(D).

**Federal Land Policy and Management Act (FLPMA)**

22.      Congress enacted the Federal Land Policy and Management Act in 1976, in part
"to provide for the management, protection, development, and enhancement of the public lands."
Pub. L. 94-579; *see also* 43 U.S.C. §§ 1701 *et seq.* Congress enacted FLPMA to ensure that the
present and future use of public lands be "projected through a land use planning process." 43
U.S.C. § 1701(a)(2). In FLPMA, Congress expressed its belief that our public lands should "be
managed in a manner that will protect the quality of scientific, scenic, historical, ecological,

COMPLAINT—7

environmental, air and atmospheric, water resource and archeological values." 43 U.S.C. § 1701(a)(8).

23.     FLPMA requires BLM to develop land use plans called "resource management plans" ("RMPs") that govern the use of the land BLM manages. 43 U.S.C. § 1712. Once a resource management plan has been developed, BLM is required to manage its lands in compliance with the plan and ensure that any site-specific projects conform to the RMP. 43 U.S.C. § 1732; 43 C.F.R. § 1610.5-3(a).

24.     BLM issued the Southwestern Oregon RMP for the Medford BLM District in 2016. The final 2016 Southwestern Oregon RMP ("2016 RMP") governs the Ashland SOS Project and associated DRs.

25.     The 2016 RMP allocates varying amounts of land to various land use categories, including late-successional reserves ("LSR"), Riparian Reserves ("RR"), and the Harvest Land Base ("HLB"). The LSRs are managed to, *inter alia*, develop, maintain, and promote northern spotted owl nesting, roosting and foraging habitat. The primary objectives for RRs are to maintain and restore riparian functions, maintain water quality, and promote the conservation and recovery of fish species listed under the Endangered Species Act ("ESA"). The HLB land use allocation is to be managed for sustained-yield timber harvest, balanced with other applicable objectives and directives.

26.     The Riparian Reserve land use allocation has management objectives to, *inter alia*, contribute to the conservation and recovery of ESA-listed fish species and their habitats and provide for conservation of Bureau Special Status fish and other Bureau Special Status riparian-associated aquatic species; maintain and restore natural channel dynamics, processes, and the proper functioning condition of riparian areas, stream channels, and wetlands by providing forest shade, sediment filtering, wood recruitment, stream bank and channel stability, water storage and

COMPLAINT—8

release, vegetation diversity, nutrient cycling, and cool and moist microclimates; maintain water quality and streamflows within the range of natural variability, to protect aquatic biodiversity, provide quality water for contact recreation and drinking water sources; meet Oregon Department of Environmental Quality (ODEQ) water quality criteria; maintain high quality water and contribute to the restoration of degraded water quality for 303(d)-listed streams; and maintain high quality waters within ODEQ-designated Source Water Protection watersheds.

27.    The 2016 RMP contains management direction to only allow road construction, stream crossings, skid trails and yarding corridors in Riparian Reserves "where there is no operationally feasible and economically viable alternative to accomplish other resource management objectives."

28.    The 2016 RMP contains other wildlife management objectives including to conserve and recover species that are ESA-listed, proposed, or candidates and the ecosystems on which they depend.

29.    The 2016 RMP specifically directs the BLM to apply logging treatments in the LSR "to speed the development of northern spotted owl nesting-roosting habitat or improve the quality of northern spotted owl nesting-roosting habitat in the stand or in the adjacent stand in the long term." While these logging treatments can temporarily degrade owl habitat, the logging must not preclude or delay by 20 years or more the development of northern spotted owl nesting-roosting habitat in the stand and in adjacent stands, as compared to development without treatment.

30.    The 2016 RMP prohibits salvage logging in late successional reserves and riparian reserves except for purposes of public safety.

**National Environmental Policy Act (NEPA)**

COMPLAINT—9

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

31.     Congress enacted the National Environmental Policy Act to declare a national policy "which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; [and] to enrich the understanding of the ecological systems and natural resources important to the Nation." 42 U.S.C. § 4321.

32.     To accomplish these purposes, NEPA and its implementing regulations set forth procedures designed to (1) ensure that federal agencies take a "hard look" at the environmental consequences of their proposed actions, and (2) foster meaningful public participation.

33.     NEPA requires all federal agencies to prepare a "detailed statement" for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). This detailed statement, known as the Environmental Impact Statement, or EIS, must describe the environmental impacts of the proposed action and alternatives to the proposed action. *Id.*

34.     If an agency is unsure if a federal action will have a significant effect on the human environment, it must prepare an Environmental Assessment ("EA") to determine if an EIS is required. 42 U.S.C. § 4336.

35.     After analyzing a proposed action, an agency may determine that it will have no significant impact on the environment and decide to implement it. For an agency's decision to be considered reasonable, a decision record and finding of no significant impact ("DR/FONSI") must be issued containing sufficient evidence and analysis to show the decision is reasonably supported by the facts. The agency must show a rational connection between the facts found and the decision rendered. If the agency fails to consider important aspects of the problem in its NEPA analysis, its decision is arbitrary and capricious.

COMPLAINT—10

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

36.     To support an agency determination of non-significance, NEPA documents must consider the direct, indirect, and cumulative environmental impacts of a proposed action.

37.     NEPA requires that environmental information be available to public officials and citizens before agency decisions are made and before any actions occur to implement the proposed project. The information released must be of high quality and sufficient to allow the public to question the agency rationale and understand the agency's decision-making process.

## FACTUAL AND ADMINISTRATIVE BACKGROUND

### The Ashland SOS Project

38.     BLM initiated scoping on a programmatic effort called the Strategic Operations for Safety ("SOS") in November 2023. BLM then released for public comment a draft environmental assessment for the programmatic SOS project on November 20, 2024.

39.     The programmatic SOS EA planning area covered approximately 250,000 acres across the Medford District of the BLM, and contemplated approximately 15,000 acres of logging over each 5-year period.

40.     Plaintiffs submitted timely comments on the programmatic SOS EA.

41.     This programmatic SOS EA was ultimately cancelled.

42.     At the same time as issuing the draft EA for the programmatic SOS project in November 2024, BLM conducted scoping on the Ashland SOS Project (which was then entitled "SOS Project 1").

43.     The Ashland SOS draft EA was issued for public comment from May 23, 2025 to June 23, 2025. It covered 5,362 acres of BLM lands near the communities of Ruch, Applegate, Jacksonville, and Buncom. BLM also held a field trip on June 11, 2025.

44.     Plaintiffs timely submitted comments on the draft EA.

45.     BLM issued the Final EA and signed FONSI on September 11, 2025.

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

46.     The EA describes three alternatives. Alternative 2 proposes three kinds of logging activities: "area treatments," "linear treatments," and "haul routes." Area treatments involve cutting trees in non-linear areas of forest. Haul route treatments involve cutting trees along portions of roads or routes where they pose a hazard to personnel. Linear treatments involve cutting trees along linear features, which are described as "prominent travel roads," including rocked and paved roads, Potential Operation Delineation ("POD") line roads, and other ingress and egress roads. Linear treatments also include PODs, which are geographic features that could aid in wildfire containment, such as ridgelines, water features, barren areas and previously burned areas.

47.     Alternative 3 proposes only linear feature treatments, no area treatments.

48.     Concurrently with the issuance of the Final EA and FONSI on September 11, 2025, BLM issued its three Decision Records authorizing activities pursuant to the Ashland SOS EA that were described under Alternative 2. These three DRs were entitled Chopper Styx, Holcomb Hollow and Apple Saws.

49.     On November 18, 2025, BLM issued a fourth DR entitled Thom Bone.

50.     Together, the four DRs authorize a total of 2,149.9 acres of logging, including 1,103.4 acres of LSR logging. Riparian Reserve logging is not specifically identified in acres under these Decision Records, but the EA identifies 606 acres of Riparian Reserve logging under Alternative 2. This includes 392 acres of Linear Feature Treatment Acres, 162 acres of Area Treatment Acres, and 126 acres in Haul Routes. Together in Riparian Reserves and LSR forest reserves, a total of 1,709.4 acres was analyzed, which is 80% of the acreage authorized for logging in the four DRs.

COMPLAINT—12

51.     Upon information and belief, the Holcomb Hollow and Apple Saws timber sales have been sold and are being implemented, while the Chopper Styx and Thom Bone sales were auctioned but not awarded.

**Northern Spotted Owl Habitat**

52.     The northern spotted owl (*Strix occidentalis caurina*) ("NSO") is a medium-sized, dark brown owl with a barred tail, white spots on the head and breast, and dark brown eyes surrounded by prominent facial disks. The NSO occupies late-successional and old-growth forest habitat from southern British Columbia through Washington, Oregon, and California as far south as Marin County, including the Last Chance Project Area.

53.     Spotted owls rely on older, mature and complex forest habitats because they generally contain the structures and characteristics required for the owl's essential biological functions of nesting, roosting, foraging, and dispersal. These structures include: a multi-layered and multi-species tree canopy dominated by large overstory trees; moderate to high canopy closure; a high incidence of trees with large cavities and other types of deformities; numerous large snags; an abundance of large, dead wood on the ground; and open space within and below the upper canopy for owls to fly. Forested stands with high canopy closure also provide thermal cover as well as protection from predation. This habitat is known as "nesting, roosting, and foraging" or "NRF" habitat.

54.     Due to concerns over widespread habitat loss and modification as well as the lack of regulatory mechanisms to protect the species, the FWS listed the NSO as "threatened" under the Endangered Species Act on June 26, 1990. 16 U.S.C. § 1533(a); *Determination of Threatened Status for the Northern Spotted* Owl, 55 Fed. Reg. 26,114 (June 26, 1990) (*codified at* 50 C.F.R. § 17.11(h)).

COMPLAINT—13

55.     Critical habitat was designated for the species in 1992 and revised in 2008, 2012 and 2021.

56.     The 2012 critical habitat rule states that "primary constituent elements" of NSO critical nesting and roosting habitat

> typically include a moderate to high canopy cover (60 to over 80 percent); a multilayered, multispecies canopy with large (greater than 30 in (76 cm) dbh) overstory trees; a high incidence of large trees with various deformities (e.g., large cavities, broken tops, mistletoe infections, and other evidence of decadence); large snags; large accumulations of fallen trees and other woody debris on the ground; and sufficient open space below the canopy for northern spotted owls to fly.

77 Fed. Reg. 71,876, 71,905 (Dec. 4, 2012).

57.     In Southern Oregon, NSO nesting and roosting habitat consists of conifer stands with a multi-layered, multi-species canopy dominated by larger conifer overstory trees, canopy cover $\geq$ 60 percent, overstory tree diameter of $\geq$ 21" diameter at breast height (dbh), > 12 trees with 20" or greater dbh trees/acre, quadratic mean diameter ("QMD") > 15" dbh, basal area from 180 to 240 ft$^3$/acre (most often greater than 240 ft$^3$/acre), and a basal area from larger trees of > 30ft$^3$ for trees > 26" dbh.

58.     Sixty percent canopy cover is the "minimum canopy cover requirement" for NRF habitat.

59.     The Medford District of BLM is within the range of the NSO.

60.     There are 36 NSO activity centers in the Ashland SOS project area.

61.     BLM consulted with United States Fish and Wildlife Service, which issued a Biological Opinion that determined that the Ashland SOS Project was likely to adversely affect 11 Northern Spotted Owl sites within the project area.

62.     The Ashland SOS Project Biological Opinion found that the Project would remove or downgrade approximately 453 acres of NRF habitat.

COMPLAINT—14

63.     The Ashland SOS Project Biological Opinion found that the Ashland SOS Project will affect 857 acres of NSO designated critical habitat.

64.     Upon information and belief, in the implementation of the Ashland SOS Project, through the Holcomb Hollow and Apple Saws sales, spotted owl nesting-roosting habitat is being removed or downgraded, not maintained as required by the DRs.

65.     Where the NRF is being removed, it will not recover to the point of being functional NRF habitat again for over 100 years, if ever.

66.     BLM admits that the proposed logging activities will not treat any insect infestations or forest pathogens.

67.     Upon information and belief, many of the previously occupied NSO activity centers will no longer be able to be occupied following implementation of the Ashland SOS Project activities.

68.     Plaintiffs have repeatedly asked for maps showing the timber sale units overlaid with NSO NRF habitat so they can see where the NRF will be affected and then ground truth whether the habitat is being maintained as required by the RMP, the Biological Opinion and the DRs. BLM has refused to provide such maps.

**Siskiyou Mountain Salamander**

69.     The Siskiyou Mountain Salamander is a bureau sensitive species that is found within the Applegate Valley watershed on the Medford District. It is associated with forested habitat with deep rocky soils or talus and rocky outcrops.

70.     On August 17, 2007, the Rogue River-Siskiyou National Forest, the Medford District of the Bureau of Land Management, and the Roseburg Field Office of the U.S. Fish and Wildlife Service entered an agreement under authority of the Endangered Species Act of 1973,

COMPLAINT—15

"to protect, conserve, and contribute to the conservation of the Siskiyou Mountains salamander by implementing conservation actions for the species and its habitat on federal lands within Jackson and Josephine Counties in southwest Oregon."

71.     For the BLM specifically, "implementation of the policy is intended to ensure that actions funded, authorized, or carried out by the BLM do not contribute to the need to list species under the [ESA]." The Agreement explains that disturbance of surface microhabitats is of primary concern because such alteration can negatively impact these salamanders. Examples of such threats are outlined explicitly in the Agreement and include timber harvest and road construction. The BLM as a signatory, agreed to "[a]dopt and implement the final Conservation Strategy for the Siskiyou Mountains salamander under which . . . populations and habitats . . . will be managed to protect their significant biological and ecological values . . . ." Further, the BLM agreed to conducting 5-year monitoring plans addressing implementation and effectiveness of the Conservation Strategy.

72.     Pursuant to the 2016 RMP, BLM is required to "implement conservation measures to mitigate specific threats to Bureau Sensitive species during the planning of activities and projects. Conservation measures include altering the type, timing, location, and intensity of management actions." Specific to SMS, the RMP requires BLM to manage the SMS consistent with the 2007 Agreement.

73.     The Ashland SOS EA indicates that BLM is aware of 91 acres of proposed logging in linear feature units that overlap the Siskiyou Mountain Salamander High Priority Habitat sites identified in the 2007 Agreement, and that there are potentially other occurrences of the species within the area.

COMPLAINT—16

74. BLM states that within these high priority sites, only hazard trees would be felled as required by OSHA and left on site to avoid potential ground disturbance of stabilized talus habitat.

75. The EA does not provide any site-specific maps of Siskiyou Mountain Salamander High Priority Sites.

76. Plaintiffs have asked BLM for site-specific maps of Siskiyou Mountain Salamander High Priority Sites but they have refused to provide them.

**Hardwood Removal**

77. The predominate Plant Vegetation Type ("PVT") in the project area is Douglas-fir- Dry (79%) which supports diverse stand compositions of conifers such as Douglas fir, ponderosa pine, sugar pine, and incense cedar, as well as hardwoods such as California black oak, pacific madrone, and canyon live oak. The second highest proportion of BLM-administered lands is Oregon white oak, which comprises 13 percent. Oregon white oak habitat often includes Douglas fir, ponderosa pine, black oak and madrone, and chaparral species (e.g., manzanita and buckbrush). These oak plant communities in southwestern Oregon provide an important convergence of California and Pacific Northwest oak communities and are the most ecologically diverse and imperiled oak habitats in the Pacific Northwest (Stephens and Gillespi 2016). These PVTs exhibit a wide variety of conditions, differing by slope, aspect, elevation and soil transitions.

78. The Ashland SOS Project EA states that all hardwood species, including madrone, black oak, and white oak will be retained unless removal is required for safety or operational purposes.

79. There is no analysis of hardwood removal in the EA or any other Ashland SOS Project document.

COMPLAINT—17

80. The DRs for the Ashland SOS EA Project also refer to the importance of hardwoods and state that they will be promoted and retained.

81. The timber sale prospectus for the Apple Saws and Holcomb Hollow sale and all other SOS related timber sales identify all hardwoods as reserve trees except where falling is necessary for safety or operational reasons and requires the purchaser to retain cut trees in the stand.

82. Despite these restrictions, in the implementation of the timber sales the BLM has permitted the contractors who purchased the Apple Saws and Holcomb Hollow timber sales to cut and remove hardwoods of all sizes and age classes across the Project area and sell these hardwoods commercially.

83. Upon information and belief, the contractor who purchased the Apple Saws timber sale, Estremado Logging, is advertising the sale of log truckloads of large logs cut from mature madrone and black oak trees in the project area.



*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*



84. On January 16, 2026, January 30, 2026, and February 10, 2026, Plaintiffs notified BLM in writing of the hardwood logging.

85. Plaintiff representatives discussed the issue on site with BLM staff on February 5, 2026.

86. Plaintiffs notified the agency on these and other occasions that hardwoods were being cut, removed and sold from the Project Area contrary to the NEPA documents and DRs, and requested that BLM stop the contractors from removing hardwoods or in the alternative, conduct additional NEPA analysis on the effects of these activities. Plaintiffs have also provided BLM with photographic evidence of hardwood removal and firewood sales.

87. Removal and sale of hardwoods in the Project area has continued in the Apple Saws and Holcomb Hollow Timber Sales.

88. The quantity and location of hardwoods being cut and removed exceeds what is required for operational feasibility.

89. Plaintiffs have documented numerous log truck loads of hardwoods being loaded at a landing above Apple Saws Timber Sale units and hauled off site by the same Estremado log

*Crag Law Center
3141 E Burnside St.
Portland, OR 97214
Tel. (503) 227-2212*

truck as identified in the Facebook marketplace advertisements for the sale of hardwood by the cord or by the log truckload.

90.    Plaintiffs have documented trailers being filled with cut, split and stacked madrone on the side of Burton Butte Road. The firewood harvester told residents that they had purchased the "firewood permit" from Estremado Logging.

91.    Plaintiffs have documented the systematic felling, yarding (including cable yarding uphill) to sorted decks consisting of just hardwood cut to length for loading into log trucks and for hauling off site.

92.    Timber Sale Appraisal information and cruise information in the Apple Saws and Holcomb Hollow Timber Sale Prospectus identify only Douglas fir in the "stumpage summary" and only Douglas fir in the "unit summary" with no unit showing any volume except Douglas fir. The only commercial product sold to timber sale purchasers in the Apple Saws or Holcomb Hollow Timber Sale was Douglas stumpage or volume, and hardwoods were specifically reserved.

93.    The effects of the logging, removal and sale of hardwoods in the Project area significantly exceeds what was analyzed and considered in the Ashland SOS EA, FONSI and DRs, and is a significant new circumstance that requires additional NEPA analysis, which Plaintiffs have requested.

94.    Plaintiffs have exhausted their required administrative participation with respect to the Ashland SOS Project.

**Riparian Logging and Yarding**

95.    The EA and Decision Record limit inner zone Riparian Reserve logging to "Linear Feature" units and only to the removal of hazard trees with an imminent fall potential.

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

Yarding of trees in the inner zone (50 feet from either side of the stream) is also prohibited, and the effects of such yarding was not analyzed in the EA.

96.     The EA and Decision Record require the retention of 30% canopy cover and 60 trees per acre in middle and outer zone Riparian Reserves.

97.     The RMP limits tree removal to 36" diameter, requiring the retention of such trees in Riparian Reserve if they must be felled for safety purposes.

98.     On January 16, 2026, Plaintiffs reported to BLM in writing that Estremado Logging had logged and yarded trees through the inner zone of a riparian reserve in Unit 32-7 of the Apple Saws timber sale. Plaintiffs provided BLM with photographic evidence. Plaintiff also reported that retention requirements in the outer zone riparian areas were not being maintained.

99.     On February 10, 2026, Plaintiffs reported to BLM in writing that Parker Excavation and Forestry had logged and yarded living green trees over 36" diameter through the inner zone of a riparian reserve in Linear Feature unit 26.1 of the Holcomb Hollow Timber Sale. Plaintiffs provided BLM with photographic evidence. Plaintiffs also reported that retention requirements in the outer zone riparian areas were not being maintained as required in the NEPA documents.

100.     Upon information and believe BLM is not maintaining the middle and outer zone Riparian Reserve retention targets that were analyzed and required by the EA and DRs.

101.     Logging and yarding in riparian areas, and particularly in the inner zones, causes sediment deliver to downstream aquatic habitats from soil disturbance and reduces shade which effects stream temperatures. Additionally, excessive logging and yarding in the outer zones reduces stream shade and impacts the connectivity value of Riparian Reserves.

COMPLAINT—21

102.     The Ashland SOS EA, FONSI and DRs did not analyze, disclose or consider effects from the level of inner and outer zone logging, yarding and removal that is occurring in the riparian areas of the Project Area.

103.     Logging, yarding and tree removal in riparian areas as is occurring in the Ashland SOS project is a significant changed circumstance requiring additional NEPA analysis, which Plaintiffs have requested, and which BLM has not completed.

**New Road Construction**

104.     The EA contemplates individual new temporary road segments of ¼ mile or less and analyzed only one mile of new road construction in the entire SOS Project Area.

105.     On January 30, 2026, Plaintiffs reported to the BLM in writing that the maps included in the Apple Saws Timber Sale Full Prospectus had identified a new road segment proposed to access unit 32-1 that is over a mile long. The proposal of this over one mile new "temporary" road exceeds what was analyzed and considered in the Ashland SOS EA, FONSI and DRs and is a significant changed circumstance requiring additional NEPA analysis, which the Plaintiffs have requested.

106.     On January 30, 2026, Plaintiffs reported to the BLM in writing that Estremado Logging had implemented unauthorized new road construction requiring excavation, leveling, and grading, as well as, removing and clearing, grubbing, and disposing of vegetation and debris in Linear Feature unit 33. Plaintiffs provided BLM with photographic evidence. This new road construction was not analyzed or disclosed in the EA or authorized in the Decision Record, but extends roughly ¼ mile out a ridgeline to a large log landing built with fill material from the road cut. Additionally, although the map legend in the Apple Saws Full Timber Sale Prospectus includes icons for both new road construction and tractor swing road construction, the official

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

maps did not identify new road construction, or even tractor swing road construction in this location, or in Linear Feature unit 33.

107.    The construction of ¼ mile of new road in this location is a significant changed circumstance requiring additional NEPA analysis, which the Plaintiffs have requested.

108.    The BLM analyzed a total of 1 mile of new temporary road construction in the EA, and together the new road proposed to access unit 32-1 and this unauthorized road segment account for approximately 1.25 miles of new temporary road construction in the Apple Saws Timber Sale alone. This level of new road construction exceeds the impacts analyzed in the NEPA documents and is a significant changed circumstance requiring additional NEPA analysis, which the Plaintiffs have requested.

109.    On February 10, 2026, Plaintiffs reported in writing to BLM that Parker Excavation and Forestry had implemented approximately 0.15 miles of new tractor swing road not analyzed in the EA, not authorized in the Decision Record, and not identified in the Holcomb Hollow Timber Full Timber Sale Prospectus. Plaintiffs provided BLM with photographic evidence. The construction of new tractor swing road in this location is a significant changed circumstance requiring additional NEPA analysis, which the Plaintiffs have requested.

110.    Upon information and belief, similar activities are now occurring in unit 4-3 of the Apple Saws Timber Sale where up to potentially a mile of tractor swing road not analyzed in the EA, not authorized in the Decision Record, and not identified in the Apple Saws Full Timber Sale Prospectus is being implemented.

111.    Upon information and belief, BLM is allowing the timber operators who purchased the Apple Saws and Holcomb Hollow sales to make other material changes to the Project implementation that were not analyzed in the NEPA analysis.

COMPLAINT—23

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

112.    BLM has failed to conduct any additional NEPA analysis on the Ashland SOS Project.

## FIRST CLAIM FOR RELIEF
**(FLPMA and APA Compliance)**

113.    Plaintiffs reallege and incorporate all preceding paragraphs herein by reference.

114.    Pursuant to the Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. § 1732(a) and its implementing regulations, 43 C.F.R. § 1610.5-3(a), BLM has a duty to ensure that a site-specific project conforms to and is consistent with the governing Resource Management Plan. The Ashland SOS Project is governed by the 2016 RMP.

115.    The 2016 RMP provides overall direction for all resources on BLM-administered lands in southwestern Oregon, including the lands at issue here, through management directions for different land use allocations. Those land use allocations include LSRs and Riparian Reserves, which will be affected by the Ashland SOS Project.

116.    Within the LSR land use allocation, the primary objective is to maintain and promote the development of habitat for the NSO and marbled murrelet. The LSR's management directions generally prohibit logging that downgrades or removes existing nesting and roosting owl habitat or precludes or delays development of NSO nesting-roosting habitat. NSO foraging habitat should be developed and maintained.

117.    The 2016 RMP specifically directs the BLM to apply logging treatments in the LSR "to speed the development of northern spotted owl nesting-roosting habitat or improve the quality of northern spotted owl nesting-roosting habitat in the stand or in the adjacent stand in the long term." While these logging treatments can temporarily degrade owl habitat, the logging must not preclude or delay by 20 years or more the development of northern spotted owl nesting-

COMPLAINT—24

roosting habitat in the stand and in adjacent stands, as compared to development without treatment.

118.    The activities authorized by the Ashland SOS Project EA, FONSI and DRs are not needed to "treat" and will not be "treating" insect infestations or forest pathogens.

119.    BLM has failed to demonstrate that the Ashland SOS EA, FONSI and DRs are consistent with this provision of the 2016 RMP, and they are not consistent, and therefore BLM's decision violates FLPMA and is arbitrary, capricious, and not in accordance with law. 5 U.S.C. § 706(2)(A).

## SECOND CLAIM FOR RELIEF
### (NEPA and APA Compliance)

### COUNT 1: FAILURE TO SUPPLEMENT THE NEPA ANALYSIS

120.    Plaintiffs incorporate by reference all preceding paragraphs.

121.    "An agency that has prepared [a NEPA document] cannot simply rest on the original document. The agency must be alert to new information that may alter the results of its original environmental analysis, and continue to take a hard look at the environmental effects of its planned action, even after a proposal has received initial approval." *Friends of the Clearwater*, 222 F.3d 552, 557 (9th Cir. 2000).

122.    The Department of Interior's 2025 NEPA Handbook document provides that the BLM must prepare supplemental NEPA analysis when major federal action remains to occur and BLM makes substantial changes to the proposed action that are relevant to environmental concerns.

123.    Major federal action remains to occur on the Ashland SOS Project.

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

124.    Authorizing and allowing the extensive cutting, removal and sale of hardwoods within the Project area is a significant change to the proposed action that will have different effects than what was analyzed and considered in the original EA and FONSI.

125.    Authorizing and allowing extensive cutting and removal of trees from riparian reserves in excess of what was authorized and analyzed in the Ashland SOS documents is a significant change to the proposed action that will have different effects than what was analyzed and considered in the original EA and FONSI.

126.    Authorizing and allowing extensive road construction in excess of what was authorized and analyzed in the Ashland SOS documents is a significant change to the proposed action that will have different effects that what was analyzed and considered in the original EA and FONSI.

127.    BLM's failure to prepare a new or supplemental analysis of environmental effects for the Ashland SOS Project in light of the changes to the Project is arbitrary, capricious, and not in accordance with NEPA, and/or is agency action unlawfully or unreasonably withheld. 5 U.S.C. § 706(1), (2)(A).

## COUNT 2 (IN THE ALTERNATIVE): FAILURE TO CONDUCT NEPA ON MAJOR FEDERAL ACTION

128.    For the purposes of NEPA, major federal action includes activities subject to Federal control and responsibility.

129.    Major federal actions can include new and continuing activities that are regulated or controlled by federal agencies.

130.    The commercial sale of logs that were cut and removed from multiple acres of Federal public land is a major federal action.

COMPLAINT—26

131.    The cutting, removal and commercial sale of hardwoods from Ashland SOS Project area is a major federal action under the control of BLM.

132.    The construction of roads, yarding corridors and landings on Federal public land is a major federal action.

133.    Logging in the inner zone of riparian areas on Federal public lands is a major federal action.

134.    Defendants have not initiated or completed the required NEPA procedures for these actions.

135.    Defendants' failure to act and/or decision to violate the National Environmental Policy Act qualifies as agency action "unlawfully withheld or unreasonably delayed" and/or is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §§ 706(1), (2)(A).

**COUNT 3: FAILURE TO TAKE A HARD LOOK AT ENVIRONMENTAL CONSEQUENCES**

136.    The APA and NEPA require that federal agencies take a "hard look" at the environmental consequences of their actions.

137.    NEPA requires agencies to engage the NEPA process at the earliest possible time and that adequate environmental analysis be prepared prior to decision making.

138.    NEPA also requires federal agencies to conduct environmental analysis in good faith before making a final decision on a proposed action. 42 U.S.C. §4332.

139.    BLM failed to take a hard look at the effects of the Ashland SOS Project, including but not limited to effects on hardwoods, effects to Siskiyou Mountain Salamander habitat, effects to NSO habitat, effects to riparian reserves and effects to soils.

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

140.    BLM's failure to take the requisite hard look at the Project's direct, indirect, and cumulative effects, and failure to make a reasoned determination of non-significance violate NEPA and its implementing regulations, and is arbitrary, capricious, an abuse of discretion, and not in accordance with and without observance of procedure required by law. 5 U.S.C. § 706(2).

## REQUEST FOR RELIEF

Plaintiffs respectfully request that this Court enter judgment in favor of Plaintiffs and issue the following relief:

1.    Declare that BLM's issuance of the Ashland SOS EA, Finding of No Significant Impact, and DRs violate FLPMA.

2.    Declare that BLM violated the National Environmental Policy Act by failing to conduct additional NEPA analysis on the significant changes made to the Ashland SOS Project, and by failing to take a hard look at the effects of the Project as proposed and approved.

3.    Declare that BLM violated the National Environmental Policy Act by failing to conduct NEPA on the major federal actions occurring within the Ashland SOS Project area.

4.    Vacate and set aside the EA, FONSI, and any and all associated DRs for the Ashland SOS Project, and order BLM to withdraw any decisions or contracts made pursuant to the DRs until such time as BLM demonstrates that it has complied with the law;

5.    Enjoin BLM and its contractors, assigns, and other agents from proceeding with implementing the Ashland SOS Project or any other activities in that Project area until such time as BLM demonstrates that it has complied with the law;

6.    Enter such other declaratory relief, and temporary, preliminary, or permanent injunctive relief as may be subsequently requested by Plaintiffs;

COMPLAINT—28

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

7.      Award Plaintiffs their reasonable fees, costs, expenses and disbursements,

including reasonable attorneys' fees associated with this litigation pursuant to the Equal Access

to Justice Act or other applicable statutes; and

8.      Grant such further relief as the Court deems just, proper, and equitable.

Respectfully submitted and dated March 3, 2026.

/s/ Meriel L. Darzen
Meriel L. Darzen, OSB # 113645
503-525-2725 │ meriel@crag.org
Kelsey Dunn, OSB # 244709
(503) 234-0788 │ kelsey@crag.org
Crag Law Center
3141 E. Burnside St.
Portland, Oregon 97214

*Attorneys for Plaintiffs*

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*