Meriel L. Darzen, OSB # 113645
(503) 525-2725 │ meriel@crag.org
Kelsey Dunn, OSB # 244709
(503) 234-0788 │ kelsey@crag.org
Crag Law Center
3141 E Burnside Street
Portland, Oregon 97214
Fax: (503) 296-5454


*Attorneys for All Plaintiffs*


## UNITED STATES DISTRICT COURT
## DISTRICT OF OREGON
## MEDFORD DIVISION

| | |
|---|---|
| **APPLEGATE SISKIYOU ALLIANCE and KLAMATH FOREST ALLIANCE**; <br><br> Plaintiffs, <br><br> v. <br><br> **UNITED STATES BUREAU OF LAND MANAGEMENT**, <br><br> Defendant. | Case No. 1:26-cv-00409-MC <br><br> **MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM IN SUPPORT** <br><br> **Oral Argument Requested** |

## **MOTION**

Plaintiffs Applegate Siskiyou Alliance and Klamath Forest Alliance ("Plaintiffs") hereby submit their *Motion for Preliminary Injunction* pursuant to Federal Rule of Civil Procedure 65(a) and Local Rule 65. Plaintiffs respectfully ask this Court to grant preliminary relief enjoining the Bureau of Land Management ("BLM") from implementing the Ashland SOS Project until this Court has had an opportunity to resolve this matter on summary judgment.

Pursuant to Federal Rule of Civil Procedure 65(a)(1) and Local Rule 7-1(a)(1), the undersigned has conferred with counsel for Defendant. Logging is on-going in two of the four BLM timber sales implementing the Ashland SOS Project. The Parties agreed upon a briefing schedule for resolution of this motion, which this court adopted. *See* ECF Nos. 7, 8. Plaintiffs requested that BLM defer awarding the contract for the third sale, Thom Bone, until briefing and argument on this motion are complete. *Id*. Defendant refused. Logging in two other sales, Apple Saws and Holcomb Hollow, is also still in progress. Unless a Preliminary Injunction is granted, BLM will continue implementing logging, removal, and sale of hardwoods without any further environmental analysis or public involvement or disclosure.

This case challenges BLM's decisions to authorize and permit logging beyond what was analyzed, disclosed and approved in the Ashland SOS Project, without conducting additional NEPA or taking the required "hard look" at these effects. This lawsuit is the unfortunate end result of years of BLM authorizing projects one way and implementing them in another, more intensive and environmentally damaging way. Plaintiffs' repeated attempts to engage with BLM to daylight and prevent these continued serious issues have been to no avail. In its decision notice for the Ashland SOS Project, BLM claimed that it would be doing salvage logging of *only* dead and dying conifers to address the "Douglas fir die-off" caused by severe drought and

MOTION FOR PRELIMINARY INJUNCTION—i

insects in Southern Oregon. In practice, however, BLM is permitting the clearcutting and removal of essentially *all* trees within the sale units, including massive quantities of mature and legacy hardwoods[1] that are not susceptible to the same mortality from drought and insects, and are in fact critical to the future of these forests in the face of climactic shifts. This hardwood felling, removal, and sale, represents a substantial, post-decisional change to the project, requiring supplemental environmental analysis and public involvement. In the alternative, if BLM was aware when it proposed and analyzed the project that hardwoods would be removed and sold at this scale, it failed to take a "hard look" at the impacts of that removal in the Environmental Assessment ("EA") and thus the EA failed to comply with NEPA.

Plaintiffs note that they pleaded several other claims in their Complaint (ECF No. 1), but at this stage, without the benefit of the administrative record, choose to advance their motion for preliminary injunction focusing solely on the issue of logging hardwood trees.

Since first discovering the massive scale at which hardwoods were being removed and commercially sold in the Ashland SOS units, Plaintiffs have diligently communicated with BLM about this issue and requested that additional NEPA be conducted before further logging occurred. BLM has declined and the logging and sale of hardwoods continued, ultimately forcing this lawsuit and this motion to seek emergency relief.

In support of this *Motion*, Plaintiffs respectfully refer this Court to the following *Memorandum in Support*, the declarations of Luke Ruediger, David Pierce, Kirsten Shockey, Shelly McMillin, Martin Paule, and Meriel L. Darzen, filed herewith, together with the exhibits thereto. A Table of Exhibits is appended to the *Memorandum*.

---

[1] Hardwoods are primarily deciduous trees native to Southern Oregon, including black oak, white oak, madrone and other non-coniferous trees.

MOTION FOR PRELIMINARY INJUNCTION—ii

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

**<u>MEMORANDUM IN SUPPORT</u>**

**TABLE OF CONTENTS**

TABLE OF CONTENTS.................................................................................................I

TABLE OF AUTHORITIES ...................................................................................... III

GLOSSARY OF TERMS ...........................................................................................VII

INTRODUCTION ......................................................................................................... 1

LEGAL FRAMEWORK AND STANDARD OF REVIEW ......................................... 2

    I.    National Environmental Policy Act ...................................................................... 2

    II.    Administrative Procedure Act............................................................................... 3

    III.    Standard of Review for Preliminary Injunction .................................................. 4

FACTUAL AND ADMINISTRATIVE BACKGROUND ............................................ 5

    I.    Management of BLM Lands in the Range of the Northern Spotted Owl, Past to Present and the 2016 RMP ................................................................................... 5

    II.  The Douglas Fir Decline Complex, Hardwoods, and Recent Problems with BLM Salvage in the Applegate…………….. ………………………………………………6

    III. The Ashland SOS Project...……………………………………………………….10

    IV. Implementation of the Ashland SOS Project and PLaintiffs' Communications and Conferrals with BLM Regarding Hardwood Removal………………………….....14

ARGUMENT................................................................................................................ 16

    I.    Jurisdiction and Standing..................................................................................... 16

    II.  Plaintiffs are Likely to Succeed on the Merits of Their Claims that BLM Violated NEPA by Failing to Supplement Their NEPA Analysis or in the Alternative, Failing to Take a Hard Look at the Effects of Logging and Selling Vast Quantities of Hardwoods from the Project. …………………………………………………………………18

        A.    The cutting, removal and sale of vast quantities of hardwood trees of all sizes in the Project area is a significant change to the Project from what was analyzed and considered in the EA and requires additional NEPA review. ................................. 18

MEMORANDUM IN SUPPORT—I

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

B.  To the extent BLM did authorize this level of hardwood removal, it failed to disclose and take a hard look at the effects of that removal as part of the Ashland SOS EA………….…………………………………………………………………..22

III.  An Injunction Is Necessary to Avoid Irreparable Harm…………………………….24

A.  Plaintiffs Will Suffer Irreparable Harm Absent a Preliminary Injunction………...25

B.  Implementation of the Project Prior to Fulfillment of Defendants' Duties Under NEPA Would Cause Irreparable Procedural Harm to Plaintiffs. ...................……26

IV.  The Balance of Hardships and Public Interest Favor an Injunction. ............................... 28

V.  Scope of Injunction……………………………………………………………………30

VI.  No Bond Should Be Required…………………………………………………….....31

CONCLUSION................................................................................................................................ 33

MEMORANDUM IN SUPPORT—II

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

# TABLE OF AUTHORITIES

**CASES**

*All. for the Wild Rockies v. Cottrell*,
  632 F.3d 1127 (9th Cir. 2011) .................................................................................... 4

*Amoco Prod. Co. v. Vill. of Gambell*,
  480 U.S. 531 (1987)............................................................................ 24, 25, 28

*Cascadia Wildlands v. BLM*,
  410 F. Supp. 3d 1146 (D. Or. 2019) ...................................................................... 2

*Cascadia Wildlands v. U.S. BLM*,
  153 F.4th 869 (9th Cir. 2025) .............................................................................. 23

*Cent. Or. Landwatch v. Connaughton*,
  905 F. Supp. 2d 1192 (D. Or. 2012) .............................................................. 31, 32

*Citizens for Better Forestry v. U.S. Dep't of Agric.*,
  341 F.3d 961 (9th Cir. 2003) ............................................................................... 25

*Dep't of Homeland Sec. v. Regents of Univ. of Cal.*,
  140 S. Ct. 1891 (2020)........................................................................................... 4

*E. Bay Sanctuary Covenant v. Trump*,
  349 F. Supp. 3d 838 (N.D. Cal. 2018), *aff'd*, 950 F.3d 1242 (9th Cir. 2020) ......................... 31

*Earth Island Inst. v. U.S. Forest Serv.*,
  87 F.4th 1054 (9th Cir. 2023) .............................................................................. 18

*Env't Prot. Info. Ctr. ("EPIC") v. Carlson*,
  968 F.3d 985 (9th Cir. 2020) ......................................................................... 26, 28

*Env't. Def. Ctr. v. Bureau of Ocean & Energy Mgmt.*,
  36 F.4th 850 (9th Cir. 2022) .................................................................................. 2

*Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*,
  98 F.4th 1180 (9th Cir. 2024) .............................................................................. 30

*Flynt Distrib. Co. v. Harvey*,
  734 F.2d 1389 (9th Cir. 1984) ............................................................................... 5

*Forestkeeper v. USFS*,
  No. 1:21-cv-01041-DAD-BAM, 2021 U.S. Dist. LEXIS 192443 (E.D. Cal. Oct. 5, 2021) .... 31

*Friends of the Clearwater v. Dombeck*,

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

222 F.3d 552 (9th Cir. 2000) ......................................................................... 3, 4, 18

*Friends of the Earth v. Laidlaw*,
   528 U.S. 167 (2000) ...................................................................................... 17

*Friends of the Earth, Inc. v. Brinegar*,
   518 F.2d 322 (9th Cir. 1975) ........................................................................ 31

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*,
   528 U.S. 167 (2000) ...................................................................................... 16

*Idaho Sporting Cong. v. Rittenhouse*,
   305 F.3d 957 (9th Cir. 2002) ................................................................... 23, 24

*Johnson v. Couturier*,
   572 F.3d 1067 (9th Cir. 2009) ........................................................................ 5

*Karuk Tribe v. Kelley*,
   No. C 10-02039 WHA, 2011 U.S. Dist. LEXIS 62645 (N.D. Cal. June 13, 2011) ................. 22

*League of Wilderness Defenders/Blue Mountains Biodiversity Project v. Connaughton*,
   752 F.3d 755 (9th Cir. 2014) ......................................................................... 26

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ................................................................................. 17, 18

*Marsh v. Or. Nat. Res. Council*,
   490 U.S. 360 (1989) ...................................................................................... 18

*Mtr. Vehicle Mfrs. Ass'n v. State Farm Auto. Ins. Co.* ("*State Farm*"),
   463 U.S. 29 (1983) ...................................................................................... 4, 23

*N. Cascades Conservation Council v. United States Forest Serv.*,
   136 F.4th 816 (9th Cir. 2025) ..................................................................... 18, 21

*Or. Nat. Desert Ass'n v. BLM*,
   625 F.3d 1092 (9th Cir. 2008) ........................................................................ 23

*Or. Natural Res. Council Fund v. Goodman*,
   505 F.3d 884 (9th Cir. 2007) ........................................................................... 4

*Or. Wild v. U.S. Forest Service*,
   No. 1:22-cv-01007-MC, 2026 U.S. Dist. LEXIS 6263 (D. Or. Jan. 13, 2026) ..................... 23

*Pac. Rivers v. BLM*,
   No. 6:16-cv-01598-JR, 2018 U.S. Dist. LEXIS 222981 (D. Or. Oct. 12, 2018) ..................... 6

MEMORANDUM IN SUPPORT—IV

*People of State of Cal. ex rel. Van De Kamp v. Tahoe Reg'l Plan. Agency*,
766 F.2d 1319 (9th Cir. 1985), *amended*, 775 F.2d 998 (9th Cir. 1985) ................................. 31

*Price Rd. Neighborhood Ass'n v. U.S. DOT*,
113 F.3d 1505 (9th Cir. 1997) ...................................................................................... 18

*Republic of the Philippines v. Marcos*,
862 F.2d 1355 (9th Cir. 1988) (*en banc*), *cert. denied*, 490 U.S. 1035 (1989).......................... 5

*Russell Country Sportsmen v. U.S. Forest Service*,
668 F.3d 1037 (9th Cir. 2011) .............................................................. 3, 18, 21, 22

*S. Fork Band Council of W. Shoshone of Nev. v. U.S. Dep't of Interior*,
588 F.3d 718 (9th Cir. 2009) ....................................................................................... 30

*Save Strawberry Canyon v. Dep't of Energy*,
613 F. Supp. 2d 1177 (N.D. Cal. 2019) ..................................................................... 27

*Seattle Audubon Soc'y v. Evans*,
771 F. Supp. 1081 (W.D. Wash. 1991)........................................................................ 29

*Seattle Audubon Soc'y v. Lyons*,
871 F. Supp. 1291 (W.D. Wash. 1994), *aff'd*, 80 F.3d 1401 (9th Cir. 1996) ............................. 5

*Seven County Infrastructure Coalition v. Eagle County* ("*Seven County*"),
605 U.S. 168 (2025)................................................................................................ 3, 23

*Sierra Club v. Marsh*,
872 F.2d 497 (1st Cir. 1989) (Breyer, J.)................................................................... 28

*Sierra Forest Legacy v. Rey*,
577 F.3d 1015 (9th Cir. 2009) ..................................................................................... 29

*Summers v. Earth Island Inst.*,
555 U.S. 488 (2009)...................................................................................................... 17

*Valle del Sol, Inc. v. Whiting*,
732 F.3d 1006 (9th Cir. 2013) ..................................................................................... 28

*W. Watersheds Proj. v. Bernhardt*,
391 F. Supp. 3d 1002 (D. Or. 2019) ..................................................................... 25, 27, 28

*W. Watersheds Proj. v. Zinke*,
336 F. Supp. 3d 1204 (D. Idaho 2018) ....................................................................... 28

MEMORANDUM IN SUPPORT—V

*Wildlands v. Warnack,*
   570 F. Supp. 3d 983 (D. Or. 2021) ............................................................................. 31

*Winter v. Natural Res. Defense Council,*
   555 U.S. 7 (2008) ......................................................................................................... 4, 24

**STATUTES**

42 U.S.C. § 4332(C) ........................................................................................................... 2

5 U.S.C. § 706(1) ............................................................................................................... 4

5 U.S.C. § 706(2) ............................................................................................................... 4

**OTHER AUTHORITIES**

Department of Interior NEPA Handbook ("DOI NEPA Handbook") (2026) ................................ 3

**RULES**

Federal Rule of Civil Procedure 65(c) ............................................................................... 31

MEMORANDUM IN SUPPORT—VI

**GLOSSARY OF TERMS**

| | |
|---|---|
| 2016 RMP | Southwestern Oregon Record of Decision and Resource Management Plan |
| APA | Administrative Procedure Act |
| BiOp | Biological Opinion |
| BLM | Bureau of Land Management |
| CEQ | Council on Environmental Quality |
| dbh | Diameter at breast height |
| DR | Decision Record |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| ESA | Endangered Species Act |
| FEIS | Final Environmental Impact Statement |
| FLPMA | Federal Land Policy and Management Act |
| FONSI | Finding of No Significant Impact |
| FWS | U.S. Fish and Wildlife Service |
| HLB | Harvest Land Base |
| LSR | Late Successional Reserve |
| LUA | Land Use Allocation |
| NEPA | National Environmental Policy Act |
| NSO | Northern spotted owl |
| NRF | Nesting, roosting, and foraging (suitable) habitat for northern spotted owls |
| NWFP | Northwest Forest Plan |
| Plaintiffs | Applegate Siskiyou Alliance, Klamath Forest Alliance |
| POD | Potential Operation Delineation |
| RMP | Resource Management Plan |
| RR | Riparian Reserve |
| SOS Project | Ashland 2025 Strategic Operations for Safety Project |

MEMORANDUM IN SUPPORT—VII

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

**INTRODUCTION**

Climate change is transforming the forests in Southern Oregon, creating new challenges for communities that live amongst them. In this case, the BLM, the federal agency that manages many of these public forests, is choosing to use a scythe instead of a scalpel to respond to these challenges. Plaintiffs, who live, work and play in and among these forests, have many concerns about BLM's approach, which amounts to aggressively clearcutting vast swaths of forest apparently in the hope of changing wildfire behavior or staving off drought and insects. However, for the purpose of this request for preliminary relief, Plaintiffs focus the court on one serious and on-going legal violation: After developing, analyzing and authorizing the Ashland SOS Project, a project with an extremely narrow purpose and need (addressing Douglas fir mortality by salvaging only dead and dying conifers), BLM is now conducting a different project – one that involves the felling, removal and sale of massive quantities of other, healthy, living, mature non-conifer trees – trees much less affected by climatic shifts, and certainly not "dead and dying." This version of the Ashland SOS Project has additional, significant environmental effects that have not been analyzed as required by NEPA.

BLM claims that the extensive logging of hardwoods is merely incidental to the conifer salvage, and is the result of OSHA regulations and their application by the logging contractors, over which BLM has no control. But Plaintiffs have documented mature hardwoods cut across the sale areas, without any apparent demarcation based on or correlation with OSHA requirements. And, even if BLM's version is true, that does not absolve the agency of ensuring NEPA compliance for the activities that it has authorized. Plaintiffs gave BLM notice of this hardwood issue both before and after the Project was analyzed and approved, including during public comment through myriad evidence of the removal of truckloads of large, mature

MEMORANDUM IN SUPPORT - 1

hardwoods. BLM failed to analyze the issue in the initial NEPA, and now, with the issue having

crystalized before it, it has declined to conduct any additional NEPA review to analyze the

effects of the project as it is actually being implemented. Thus, BLM has violated NEPA either

by failing to supplement its NEPA analysis to account for the massive hardwood removal that it

failed to anticipate but is now occurring, or by failing to take a "hard look" at this issue in the

first instance if these effects were reasonably foreseeable. Either way, BLM is violating NEPA,

Plaintiffs are being irreparably harmed, and the equities weigh in favor of issuing a narrow

injunction preventing BLM from continuing this massive removal program until it complies with

NEPA.

**LEGAL FRAMEWORK AND STANDARD OF REVIEW**

**I.      National Environmental Policy Act**

The National Environmental Policy Act of 1969 ("NEPA") is a procedural statute that

"requires federal agencies to take a 'hard look' at the environmental consequences of their

actions." *Env't. Def. Ctr. v. Bureau of Ocean & Energy Mgmt.,* 36 F.4th 850, 872 (9th Cir. 2022).

NEPA requires agencies to prepare an Environmental Impact Statement ("EIS") for "major

Federal actions." 42 U.S.C. § 4332(C). If an agency is unsure whether its action will have

significant environmental impacts, it may prepare an Environmental Assessment ("EA") first.

As this Court has explained, a "'hard look' requires a consideration of all foreseeable

direct and indirect impacts and a full assessment of the cumulative impacts of the proposed

action." *Cascadia Wildlands v. BLM*, 410 F. Supp. 3d 1146, 1156 (D. Or. 2019). "To take the

required 'hard look' at a proposed project's effects, an agency may not rely on incorrect

assumptions or data." *Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 964 (citing

40 C.F.R. § 1500.1(b)) ("Accurate scientific analysis, expert agency comments, and public

MEMORANDUM IN SUPPORT - 2

scrutiny are essential to implementing NEPA."). Nor is it sufficient to make speculative, conclusory statements about the impact of an action. *Nat'l Parks & Conserv. Ass'n v. Babbitt*, 241 F.3d 722, 735 (9th Cir. 2001). The "hard look" requirement applies in the context of an EA. *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1211 (9th Cir. 1998).

Recently, in *Seven County Infrastructure Coalition v. Eagle County* ("*Seven County*"), the Supreme Court affirmed that "[t]he bedrock principle of judicial review in NEPA cases can be stated in a word: Deference." 605 U.S. 168, 185 (2025). This means that through the lens of the arbitrary and capricious standard of review, the court's role is to "confirm that the agency has addressed environmental consequences and feasible alternatives as to the relevant project." *Id*. at 180. The Supreme Court confirmed that the agency action must be "reasonable and reasonably explained." *Id.*

"An agency that has prepared [a NEPA document] cannot simply rest on the original document. The agency must be alert to new information that may alter the results of its original environmental analysis, and continue to take a hard look at the environmental effects of its planned action, even after a proposal." *Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 557 (9th Cir. 2000). The Department of Interior's 2026 NEPA Handbook ("DOI NEPA Handbook") document reaffirms that the BLM must prepare supplemental NEPA analysis when major federal action remains to occur and BLM makes substantial changes to the proposed action that are relevant to environmental concerns.[2] *See also Russell Country Sportsmen v. U.S. Forest Service*, 668 F.3d 1037, 1045 (9th Cir. 2011).

## II.    Administrative Procedure Act

---

[2] 516 DM 1, U.S. Department of Interior Handbook of National Environmental Policy Act Procedures at 19, available at https://www.doi.gov/media/document/doi-handbook-nepa-procedures.

Plaintiffs' NEPA claims are reviewed pursuant to the APA, 5 U.S.C. § 706(1), (2)(A). *Or. Natural Res. Council Fund v. Goodman*, 505 F.3d 884, 889 (9th Cir. 2007). "The APA sets forth the procedures by which federal agencies are accountable to the public and their actions subject to review by the courts." *Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 140 S. Ct. 1891, 1905 (2020) (citation omitted). Under the APA, "agencies must engage in reasoned decisionmaking." *Id.* Agency actions must be "set aside" if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or adopted "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D). Agency action is arbitrary and capricious where the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency[.]" *Mtr. Vehicle Mfrs. Ass'n v. State Farm Auto. Ins. Co.* ("*State Farm*"), 463 U.S. 29, 43 (1983). In the alternative, an agency's inaction when confronted with significant new circumstances and information constitutes unlawful failure to act in violation of 5 U.S.C. § 706(1). *Friends of the Clearwater*, 222 F.3d at 560.

## III.   Standard of Review for Preliminary Injunction

A plaintiff seeking a preliminary injunction must establish (1) it is likely to succeed on the merits; (2) it will likely suffer irreparable harm absent the injunction; (3) that the balance of the equities tips in the plaintiff's favor; and (4) that the injunction would serve the public interest. *Winter v. Natural Res. Defense Council*, 555 U.S. 7, 20 (2008).

Courts in the Ninth Circuit employ a "sliding scale" approach in which, for example, "a stronger showing of irreparable harm to plaintiff might offset a lesser showing of likelihood of success on the merits." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131–32 (9th Cir. 2011). Under this approach, a preliminary injunction may issue where the plaintiff's likelihood

MEMORANDUM IN SUPPORT - 4

of success is such that "serious questions going to the merits [are] raised and the balance of hardships tips sharply in plaintiff's favor." *Id*. This is often referred to as the "serious questions" approach. *Id*. at 1132. "Serious questions" are those that "cannot be resolved one way or the other at the hearing on the injunction and as to which the court perceives a need to preserve the status quo lest one side prevent resolution of the questions or execution of any judgment by altering the status quo." *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988) (*en banc*), *cert. denied*, 490 U.S. 1035 (1989). They are "substantial, difficult, and doubtful" such that they are "a fair ground for litigation and thus for more deliberative investigation." *Id*.

When deciding whether to issue a temporary restraining order or preliminary injunction, the court may rely on declarations, affidavits, and exhibits, among other things. *See Johnson v. Couturier*, 572 F.3d 1067, 1083 (9th Cir. 2009). This evidence need not conform to the standards that apply at summary judgment or trial. *Id; Flynt Distrib. Co. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984).

## FACTUAL AND ADMINISTRATIVE BACKGROUND

I.    **Management of BLM Lands in the Range of the Northern Spotted Owl, Past to Present, and the 2016 RMP**

BLM administers 2.5 million acres of federal public lands in western Oregon. These lands are within the range of the ESA-listed northern spotted owl ("NSO"). In 1994, BLM and Forest Service adopted the Northwest Forest Plan ("NWFP"), which was designed to provide a holistic management program for all 24.5 million acres of federal forest lands throughout the NSO's range. *See Seattle Audubon Soc'y v. Lyons*, 871 F. Supp. 1291, 1304–06 (W.D. Wash. 1994), *aff'd*, 80 F.3d 1401 (9th Cir. 1996). BLM then adopted regional Resource Management Plans in 1995, which incorporated the NWFP's standards and guidelines. This management, in

MEMORANDUM IN SUPPORT - 5

simple terms, had two main categories:[3] reserves ("Late-Successional Reserves and Riparian Reserves") and matrix. *Id.* at 1304–05. The reserves were designed in large part to protect or accelerate older forest habitat for the NSO and other late-successional species, and the matrix was designed to provide commercial timber. *Id.*

In 2016, BLM adopted the Southwestern Oregon Record of Decision and Resource Management Plan ("2016 RMP"), removing itself from the NWFP to increase timber output. *See Pac. Rivers v. BLM*, No. 6:16-cv-01598-JR, 2018 U.S. Dist. LEXIS 222981, *14 (D. Or. Oct. 12, 2018). Like the previous plans, the 2016 RMP divided BLM lands into multiple management categories: 19 percent are designated as Harvest Land Base ("HLB"), 38 percent as LSR and 26 percent as Riparian Reserves. *Id.* at *6. The LSRs are explicitly necessary to develop large contiguous blocks of forests and were again designed to ensure the survival of federally listed species, namely the NSO and marbled murrelet, while the HLB was designed to provide a stable timber supply.

## II.    The Douglas Fir Decline Complex, Hardwoods, and Recent Problems with BLM Salvage in the Applegate

A recent published scientific journal article, *Bennett et al* (2023)[4], indicates that Douglas fir mortality in forests across Jackson, Josephine and Douglas Counties, including BLM-managed forests, is increasing since 2015. The study focuses on three causes of the mortality: harsh site conditions, increases in drought and heat, and insects. Before 2015, Douglas fir

---

[3] Also referred to as "land use allocations."

[4] Bennett, M., D. C. Shaw, and L. Lowrey. 2023. Recent Douglas-fir Mortality in the Klamath Mountains Ecoregion of Oregon: Evidence for a Decline Spiral. Journal of Forestry 121:246-261. Available at:
https://www.nwfirescience.org/sites/default/files/publications/2023%20Bennett%20et%20al%20DF%20mort%20Klamath%20mts%20fvad007%5B23%5D.pdf .

MEMORANDUM IN SUPPORT - 6

mortality in the region commonly increased for a year or two immediately after a drought. Since 2015, however, the *Bennett* study states that mortality levels remained high and more trees died in the four-year period from 2015-2019 than in the previous four decades. The most severe die-back has occurred in the Applegate Valley and the fringes of Bear Creek Valley, the areas where the Ashland SOS Project is located. Max Bennett, one of the authors of the *Bennett* study, along with Christopher Adlam, authored a second article for OSU Extension that suggests that typical restoration activities for areas affected by Douglas fir mortality is for land managers to thin the affected conifers, shift to drought-tolerant species, reduce fuel loads and reintroduce low intensity fire.[5]

Meanwhile, the forests where Douglas fir mortality is occurring are a diverse mix of hardwood and conifer forests, particularly as compared to, for example, the moist conifer-dominated forests further to the north and west. The predominate Plant Vegetation Type ("PVT") in the Ashland SOS Project area is Douglas-fir- Dry (79%) which supports diverse stand compositions of conifers in addition to Douglas fir, including ponderosa pine, sugar pine, and incense cedar, as well as hardwoods such as California black oak, pacific madrone, and canyon live oak. Declaration of Meriel Darzen ("Decl. Darzen"), Ex. 1 (Ashland SOS Project Final EA) at 127. The second highest proportion of these forest ecotypes is Oregon white oak, which comprises 13 percent. *Id.* Oregon white oak habitat often includes some Douglas fir, as well as ponderosa pine, hardwoods like black oak and madrone, and chaparral species (e.g., manzanita and buckbrush). Id. The hardwoods are important for wildlife: acorns from oak trees are important for a wide variety of species and in particular for winter storage, and madrone berries

---

[5] Bennett, M., and C. Adlam. 2023. Trees on the edge—Understanding Douglas-fir decline and mortality in Southwest Oregon. Available at https://extension.oregonstate.edu/catalog/em-9406-trees-edge.

MEMORANDUM IN SUPPORT - 7

are loved by song birds, including large flocks of robins that overwinter in the Applegate and migrate into the area from Alaska, Canada, and the far north. Declaration of Luke Ruediger ("Decl. Ruediger") at ¶ 63.[6] Hardwoods are also important for the cavity habitat they provide for wildlife. These cavities are utilized by woodpeckers, song birds, owls, Pacific fishers, squirrels, and a myriad of wildlife species. *Id.* They are also often the most drought hardy, fire and climate resilient species on the landscape, and do not host or succumb to beetle infestation. This makes them some of the most resilient and reliable species in the dry interior forests of the Applegate Valley. *Id.*

BLM has authorized other recent projects, before the Ashland SOS Project, that were purported to address Douglas Fir mortality in these forests. These projects were not intended to restore the affected landscape, using the management activities that Bennett and Adlam suggest, but rather to salvage the merchantable timber from dead and dying trees. Three such projects are the Boaz Salvage Timber Sale Categorical Exclusion ("Boaz"), the Forest Creek Salvage Timber Sale Categorical Exclusion, and the Lickety Split Salvage Timber Sale Categorical Exclusion. Decl. Darzen, Ex. 1 at 50. Plaintiff Applegate Siskiyou Alliance monitored each of these sales and documented the problems with their implementation. *See* Decl. Ruediger, ¶¶ 41-43, Figs. 2 & 3; Ex. 3. Specifically, despite being proposed as projects that would remove only "dead and dying" trees, post-logging monitoring showed that the units were clearcut, leaving only an average of 3-5 trees per acre across 750 acres total. *Id.,* Ex. 3 at 1, 8, 11.

---

[6] See also Field Guide to the Forested Plant Associations of Southwestern Oregon. USDA Forest Service, Pacific Northwest Region. September 1996. Technical Paper R6-NR-ECOL-TP-17-96. Available at:
https://www.fs.usda.gov/sites/nfs/files/r06/publication/fseprd1178143.pdf

MEMORANDUM IN SUPPORT - 8



Unit 34-2 of the Boaz Salvage Timber Sale logged very steep slopes to only 1.4 trees per acres following logging operations. See Decl. Ruediger, Ex. 3 (Salvage Sale Profiles).

There were other implementation issues with these three sales, including a post-logging land slide in the Boaz sale, logging in riparian reserves and the removal of *all* vegetation including understory and hardwoods, contrary to the project documents. Decl. Ruediger, ¶¶ 41-43, Figs. 2 & 3, Ex. 3.

MEMORANDUM IN SUPPORT - 9



The landslide in unit 27-5 on March 17, 2025 shows that the slope failure occurred within a recently clearcut slope with very minimal tree retention. This will become a legacy sediment source in the Neds Gulch watershed and will remain an erosive, unstable slope for decades. See Decl. Ruediger, Ex 3 (Salvage Sale Profiles).

Plaintiffs meticulously detailed the issues with the implementation of these three salvage sales and provided them to BLM in numerous communications between 2024 and the present. Decl. Ruediger, ¶ 42. Plaintiffs repeatedly asked BLM to conduct additional NEPA analysis and to take a lighter touch with future salvage logging. *Id.*

## III.    The Ashland SOS Project

BLM initiated scoping on a very large programmatic effort to salvage log dead and dying Douglas firs across the Medford District of the BLM called the Strategic Operations for Safety ("SOS") in November 2023. Decl. Darzen, Ex. 1 at 76. BLM released for public comment a draft environmental assessment ("EA") for the programmatic SOS project on November 20, 2024. *Id.* The programmatic SOS EA planning area covered approximately 250,000 acres across the

MEMORANDUM IN SUPPORT - 10

Medford District, and contemplated logging approximately 15,000 acres over each 5-year period. *Id.* Plaintiffs submitted timely comments on the programmatic SOS EA but that program was ultimately cancelled. Decl. Ruediger, ¶ 11; Decl. Darzen, Ex.1 at 77. At the same time as issuing the draft EA for the programmatic SOS project in November 2024, BLM conducted scoping on the Ashland SOS Project (which was then entitled "SOS Project 1"). The Ashland SOS draft EA was issued for public comment from May 23, 2025 to June 23, 2025. Decl. Darzen, Ex. 3 at 5. It covered approximately 5,000 acres of BLM-managed public lands in multiple land allocations, including LSRs and Riparian Reserves, near the communities of Ruch, Applegate, Jacksonville, and Buncom. BLM also held a field trip on June 11, 2025. *Id.*

Concurrently with the issuance of the Final EA and finding of no significant impact ("FONSI") on September 11, 2025, BLM issued three Decision Records ("DRs") authorizing activities pursuant to the Ashland SOS EA that were described under Alternative 2. *See* Decl. Darzen, Exs. 3, 4, 5. These three DRs were entitled Chopper Styx, Holcomb Hollow and Apple Saws. On November 18, 2025, BLM issued a fourth DR entitled Thom Bone. *See Id.*, Ex. 6 (DR #4). Together, the four DRs authorize a total of 2,149.9 acres of logging, including 1,103.4 acres of logging in Late Successional Reserves. The EA identifies 606 acres of Riparian Reserve logging under Alternative 2. Decl. Darzen, Ex. 1 at 24. This includes 392 acres of Linear Feature Treatment Acres, 162 acres of Area Treatment Acres, and 126 acres in Haul Routes. Together in Riparian Reserves and LSRs, logging of a total of 1,709.4 acres was analyzed, which makes up 80% of the acreage authorized for logging in the four challenged DRs. *Id.* The Holcomb Hollow and Apple Saws timber sales have been sold and are being implemented. Upon information and belief, the Thom Bone sale was auctioned and has a high bidder but the contract has not yet been awarded.

MEMORANDUM IN SUPPORT - 11

The Ashland SOS Project has a narrow and specific purpose and need, as set out in the Environmental Assessment ("EA"). The stated need for the Project, similar to the previous three salvage sales, is that "widespread conifer mortality is creating public safety concerns… which can be avoided, reduced, or minimized by removing dead and dying conifers." Decl. Darzen Ex. 1 at 15, 16. The purpose of the project, in turn, is to: "remove or salvage dead and dying conifers to enhance safety for the public and fire personnel by addressing the high levels of hazardous fuel accumulations, thereby decreasing the risk of wildfires to [] communities and improving safe and effective fire management operations." *Id.*

Table 3. Purpose and Need for Action

| Need | Purpose |
|---|---|
| Widespread conifer mortality is creating public safety concerns, including immediate risks from overhead hazards and both short- and long-term risks due to high levels of fuel loading within one mile of residential areas, which can be avoided, reduced, or minimized by removing dead and dying conifers. | Remove or salvage dead and dying conifers to enhance safety for the public and fire personnel by addressing the high levels of hazardous fuel accumulations, thereby decreasing the risk of wildfires to WDA communities and improving safe and effective fire management operations. Use various available methods for implementation, including commercial timber sales and stewardship funds.<br><br>Applies to purposes listed above:<br><br>• Treat natural hazardous fuels for the following reasons:<br>  ○ Modify the fuel profile.<br>  ○ Reduce potential fire behavior.<br>  ○ Reduce potential fire severity.<br>  ○ Improve effective fire management opportunities within the wildland urban interface or in close proximity to other highly valued resources (2016 ROD/RMP p. 91).<br>• Create fuel beds or fuel breaks that reduce the potential for high-intensity/high-severity fire spread within the wildland urban interface or in close proximity to highly valued resources (2016 ROD/RMP p. 91).<br>• Maintain access to roads and facilities by removing hazard trees and blowdown (2016 ROD/RMP pp.54, 55, 71, 75, 92, 96). |

*Id.* at 16.

The Project involves three kinds of tree-felling activities: strategic linear treatments, area treatments, and haul road treatments. *Id.* at 18. Each of these tree-felling categories focuses on "removal and salvage of dead and dying conifers." *Id.* The Linear Feature activities involve such

MEMORANDUM IN SUPPORT - 12

tree removal along "prominent travel roads and Potential Operation Delineation (POD) boundaries."[7] *Id.* at 12. The project also contemplates "Area treatments" which involve cutting and removing dead and dying conifers, "salvage" and associated activity fuels treatments beyond the Linear Feature treatments and deeper into the forested stands, up to one mile away from Wildland Development Areas. *Id.* at 24. These Area treatments are to be conducted in Late Successional Reserves, Harvest Land Base, and Riparian Reserves. The final type of harvest activity is "Haul Route Treatments" which involve removal and salvage of dead and dying conifers and activity fuels treatments along haul routes up to 1.5 tree lengths along each side of the route. *Id.* at 26. Each of these types of treatments has specific sideboards and criteria. There will also be temporary road construction and road renovations within the Project area.

The EA states that BLM will "retain all hardwood species unless removal is required for safety or operational purposes." *Id.* at 19. The EA similarly says "retain all conifer trees ≥ 36 inches in diameter, and all hardwoods ≥ 24 inches in diameter, except where falling is necessary for safety or operational reasons. If such trees need to be cut for safety or operational reasons, retain cut trees in the stand where operationally possible." *Id*. In a separate section, the EA states that hardwoods over 8 inches DBH will not be cut unless necessary for safety or operational purposes. *Id.* In the Section of the EA that analyzes "Affected Environment & Environmental Consequences", there is no analysis or disclosure of effects to hardwoods from this logging. The Decision Records state repeatedly that hardwoods will be maintained, retained and even "promoted." Decl. Darzen, Ex. 3 at 25, 34, 52.

Because the Project may affect and is likely to adversely affect the Northern Spotted Owl and its habitat, BLM consulted with the United States Fish and Wildlife Service (FWS) pursuant

---

[7] *See Id.* at 20, n4 and n5 (describing haul route designation and PODS).

MEMORANDUM IN SUPPORT - 13

to ESA Section 7. This consultation resulted in FWS producing a Biological Opinion for the Project. Decl. Darzen, Ex. 1 at 77, *see also* Decl. Darzen Ex. 7 (Biological Opinion).

Plaintiffs submitted scoping comments on the Ashland SOS Project (then entitled Project #1) on comments on January 5, 2025. Decl. Ruediger, Ex. 1. Plaintiffs submitted comments on the draft EA on June 22, 2025. *Id.,* Ex. 2. These comments addressed numerous issues, including highlighting concerns about the damage and removal of hardwoods, logging in riparian areas, logging in spotted owl habitat and issues with the previous salvage sales. *See, e.g., id.* at 1-2.

**IV.    Implementation of the Ashland SOS Project and Plaintiffs' Communications and Conferrals with BLM Regarding Hardwood Removal**

As far as Plaintiffs are aware, implementation of the Ashland SOS Project began on January 1, 2026 via the Holcomb Hollow and Apple Saws timber sales. Between that date and the present, Plaintiffs' members have spent tens of hours monitoring within the timber sale units in the Project, visiting many of them multiple times, and have had many communications with BLM concerning the Project. *See* Decl. Ruediger, ¶¶ 59-71; 72-89 (detailed description of communications) and Exs. 4-7. Plaintiffs have documented and advised BLM of numerous discrepancies in Project implementation from what was analyzed in the EA and authorized in the DRs. *See id*. These include wet weather logging, logging within riparian reserves including through stream corridors, felling of trees marked to be reserved, hardwood removal and sale, logging trees over 36" diameter and logging on extremely steep slopes. *See* Decl. Ruediger, ¶¶ 72-89, Figures 4-19, Exs. 4-6. This documentation occurred through multiple rounds of emails and one field visit that included a Plaintiff representative and a BLM representative. *See id.* at 72-89.

Plaintiffs first notified BLM of the removal and sale of hardwoods in excess of what was analyzed and approved on January 16, 2026. Plaintiffs provided specific photographic evidence

MEMORANDUM IN SUPPORT - 14

and documentation of Estremado Logging, the purchaser of the Apple Saws timber sale, trucking

log trucks full of hardwood logs from the Apple Saws units. Decl. Ruediger, Fig. 4-7. *See also*

ECF No. 1 (Complaint), ¶ 83.



*A red Estremado log truck at the intersection of Cantrall Road and Hamilton Road just below the Apple Saws Timber Sale. The double bunk load is all madrone and has no tags or log stamps tracking commercial tree removal. Photo taken by Luke Ruediger on February 10, 2026. Decl. Ruediger, Fig. 5.*

On February 27, 2026, counsel for Plaintiffs sent a letter to Lauren Brown, Ashland

Field Manager, requesting a meeting with BLM and asking specific questions about, *inter alia*,

BLM's actions relating to the removal of hardwoods in the Project area, the maintenance of

riparian buffers and protection of NSO habitat. Decl. Darzen, Ex. 8. BLM responded via email

but did not agree to a meeting or provide any of the information requested. *Id.*, Ex. 9.  The

hardwood removal continued and has been constant for approximately 3 months, with Plaintiffs'

MEMORANDUM IN SUPPORT - 15

members documenting trucks full of hardwoods as recently as April 9, 2026. Plaintiffs have

continued to send evidence to BLM and their counsel, which BLM has acknowledged. Decl.

Darzen, Ex. 10 at 5.



Log trucks full of hardwood logs from the Project area, taken on April 2. *See* Decl. Darzen, Ex. 10 at 9.

## ARGUMENT

**I.        Jurisdiction and Standing**

As set forth in the declarations filed herewith, Plaintiffs are non-profit organizations

whose members, supporters, and staff use and enjoy the public lands managed by the Medford

District BLM, and whose interests are harmed by the approval of the Ashland SOS Project but

would be redressed by a favorable decision. "[E]nvironmental plaintiffs adequately allege injury

in fact when they aver that they use the affected area and are persons for whom the aesthetic and

recreational values of the area will be lessened by the challenged activity." *Friends of the Earth,*

*Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 183 (2000) (citations omitted). The injury here

MEMORANDUM IN SUPPORT - 16

is "imminent".[8] The BLM is implementing the Ashland SOS Project via several timber sales. *See* Decl. Darzen, Exs. 3-6. Within the project area, Plaintiffs' members use and enjoy the public lands for a variety of personal and professional recreational, scientific, and spiritual purposes and have firm plans to return.

Shelly McMillin is a member of Applegate Siskiyou Alliance since 2022. Decl. McMullin, ¶ 3. She has spent 37 years exploring the BLM lands in and adjacent to the Project Area, recreating there multiple times a week until the logging occurred, impacting her recreational enjoyment in that area. Id., ¶ 6. Her property is served by a spring located within Unit LF-32 of the Apple Saws timber sale. She holds a water right for that water from that spring. BLM logged within 80" of the spring and she is concerned about further effects to her spring from additional logging. Id., ¶ 9. Many other members of Plaintiffs have a history of regularly using the Project area for a variety of personal, professional, recreation, and spiritual purposes and have firm plans to return. *See e.g.* Decl. Martin Paule, ¶¶ 6–13, Decl. David Pierce, ¶¶ 6, 21; Decl. Kristen Shockey, ¶¶ 31–34; Decl. Ruediger, ¶¶ 17-33; *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 572–73 (1992).

Because Plaintiffs' members' interests would be and are being irreparably damaged by implementation of Ashland SOS Project, and the remedy requested will redress the injury, Plaintiffs have standing.[9] *See Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009) ("While generalized harm to the forest or the environment will not alone support standing, if that harm in

---

[8] An "injury in fact" must be "actual or imminent, not conjectural or hypothetical." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (citations omitted).

[9] Because Plaintiffs' members have standing, Plaintiffs themselves have organizational standing to bring the case. *See Friends of the Earth v. Laidlaw*, 528 U.S. 167, 181 (2000).

fact affects the recreational or even the mere esthetic interests of the plaintiff, that will suffice.").

*Lujan,* 504 U.S. at 572–73 n.7.

**II.    Plaintiffs are Likely to Succeed on the Merits of Their Claims that BLM Violated NEPA by Failing to Supplement Their NEPA Analysis or in the Alternative, Failing to Take a Hard Look at the Effects of Logging and Selling Vast Quantities of Hardwoods from the Project.**

    **A.    The cutting, removal and sale of vast quantities of hardwood trees of all sizes in the Project area is a significant change to the Project from what was analyzed and considered in the EA and requires additional NEPA review.**

NEPA does not permit agencies to stand idly by after making their decisions. Rather, the agency must be alert to changing conditions, and supplement its analysis where a project is substantially changed, or where new information reveals that the project will impact the environment in significant ways that were not previously addressed or considered. *Friends of the Clearwater*, 222 F.3d at 557 (citing *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 374 (1989)); *see, e.g.*, *Price Rd. Neighborhood Ass'n v. U.S. DOT*, 113 F.3d 1505, 1508–09 (9th Cir. 1997) ("if the environmental impacts resulting from [a] design change are significant or uncertain, as compared with the original design's impacts, a supplemental EA is required").

The Ninth Circuit has held that when there are changes to a proposed action, "supplementation is not required when two requirements are satisfied: (1) the new alternative a minor variation of one of the alternatives discussed in the draft EIS and (2) the new alternative is qualitatively within the spectrum of alternatives that were discussed in the draft EIS." *Russell Country Sportsmen*, 668 F.3d at 1045 (internal quotation marks and citation omitted, alternations normalized, emphasis in original); *see also*, *N. Cascades Conservation Council v. United States Forest Serv.,* 136 F.4th 816, 825 (9th Cir. 2025) (citing *Russell Country Sportsmen* at 1048-49); *Earth Island Inst. v. U.S. Forest Serv.,* 87 F.4th 1054, 1072 (9th Cir. 2023) ("the [Forest] Service, like any agency, has a duty to gather and evaluate new information relevant to the

MEMORANDUM IN SUPPORT - 18

environmental impact of its actions). The post-decisional changes to the Ashland SOS Project do not fall into either of these buckets; thus supplementation is required.

The most obvious and major change to the Project is that, instead of retaining hardwood trees in the Ashland SOS units, as disclosed, analyzed and authorized by the project documents, BLM is allowing felling, removal and sale of large quantities of hardwoods, which are a substantial component of these forests. The Ashland SOS project was supposed to address one particular issue: "a growing safety risk posed by widespread <u>conifer</u> mortality." Decl. Darzen, Ex. 1 at 9 (emphasis added). Each of the three vegetation removal activities was described as removing **only conifers** to address this purpose. *Id.* at 10 ("The BLM Ashland Field Office is responding to recent widespread conifer mortality by proposing to salvage or remove dead and dying conifers of all size classes that, in BLM's professional assessment, present a public safety hazard and require removal to reduce or eliminate that risk."). The only times hardwood trees are referenced in the EA and Decision Records is to note that they are to be reserved from cutting except as required for operational or safety reasons, and retained onsite where operationally possible. Decl. Darzen, Ex. 1. at 19, Ex. 3 at 25, 34.

When the BLM began implementing the Ashland SOS project, via the Apple Saws and Holcomb Hollow timber sales, Plaintiffs' members, many of whom live adjacent to the logging units and visit them regularly, discovered that in both the Area units and the Linear Feature units, approximately 80 percent of the hardwoods were being removed along with the conifers in the units. *See* Decl. Ruediger, ¶ 63. Plaintiffs also obtained evidence that the hardwoods, which were not included in the timber volume purchased, were being commercially sold by Estremado. Plaintiffs provided this evidence to BLM and raised questions as to why they were allowing this to occur, as it was contrary to the NEPA documents. *See* Decl. Ruediger, Ex. 6 at 5; Ex. 7 at 6.

MEMORANDUM IN SUPPORT - 19



*Extensive hardwood removal in unit 5-6 of the Apple Saws Timber Sale. The photo shows whole slopes cleared of both live conifers and live hardwood trees, including black oak and Pacific madrone. Photo taken by Luke Ruediger on February 8, 2026. See Decl. Ruediger, Fig. 4.*

Despite BLM being notified at least four separate times of the removal and sale of hardwoods, and that the scale of this removal goes far beyond what was reasonably anticipated by the EA and FONSI, the removal and sale continues.

In conferrals, BLM responded that the reason for the on-going hardwood removal is that hardwoods may be cut for operational or safety purposes, which is a judgment call made by the logger in the field and BLM does not evaluate those calls. Decl. Darzen, Ex. 10 at 3. In other words, whether hardwoods are being removed in excess of what is for operational or safety purposes is not BLM's responsibility. *Id.* ("OSHA compliance relies upon trained feller judgment in the field, not on BLM… there is no criteria by which BLM could evaluate purchasers' judgment calls.").

MEMORANDUM IN SUPPORT - 20

Whether or not BLM believes it can weigh in on the felling of danger trees for OSHA purposes, BLM authorized the Ashland SOS project and has the ongoing responsibility to ensure that the activities occurring on BLM-managed public lands are NEPA-compliant. *Friends of the Clearwater*, 222 F.3d at 557 (an agency cannot rest on the original NEPA document, it must be alert to new information that may alter the results of the original analysis). And the fact of the matter is that the intensity and scale of felling, removal and sale of hardwoods that is occurring in the Ashland SOS Project is a substantial change to the Project from what was originally disclosed and analyzed, requiring NEPA supplementation pursuant to *Russell Country Sportsmen*. 668 F.3d at 1045; *see also* DOI NEPA Handbook at 19.

First, the removal and sale of vast quantities of hardwoods to such a scale that they are filling numerous log truck loads on a daily basis is not a minor variation of any of the alternatives discussed in the EA. In fact, it is inconsistent with, or at the very least outside the scope of, the purpose of the Project. The project is solely aimed at removal of dead and dying **conifers**, which are in such condition as a result of environmental changes that do not affect hardwoods in the same way. Decl. Darzen, Ex. 1 at 15-16. Not only that, but the retention of hardwoods, and especially large hardwoods, was a core underlying assumption of the analysis of the Ashland SOS Project. Decl. Darzen, Ex. 1 at 19, Ex. 3 at 25, 34, 52; *see also* Decl. Darzen Ex.7 at 40; *cf. N. Cascades Conservation Council,* 136 F.4th at 825 (noting that even "a new alternative that *lessens* the environmental impacts yet alters the overall cost-benefit analysis, goes 'to the heart' of the proposed action, or poses new environmental questions that may require supplementation.") (citing *Russell Country Sportsmen* at 1048-49). Therefore, the current implementation cannot be a variation on any of the alternatives considered. Rather, what is occurring here – total or near total removal of all sizes of madrone trees and other hardwoods

MEMORANDUM IN SUPPORT - 21

that will leave the units unable to sustain a new forest after the conifers are removed – is a significantly different action, which increases the environmental impacts, and requires new NEPA analysis. *Compare with Karuk Tribe v. Kelley*, No. C 10-02039 WHA, 2011 U.S. Dist. LEXIS 62645, at *16 (N.D. Cal. June 13, 2011) (impact to hardwoods was not beyond what was analyzed because original EIS had disclosed percentage of hardwoods that would be affected and accounted for those effects.).

Second, the on-going hardwood removal is also not within the "spectrum of alternatives" analyzed because it has materially different environmental effects, none of which were disclosed or alluded to in the NEPA documents, even though Plaintiffs and other members of the public brought it up. Decl. Ruediger, Ex. 1 at 28; *Russell Country Sportsmen*, 668 F.3d at 1045. The EA itself is completely devoid of any consideration of the effects of cutting, removing and selling hardwoods, including large, old madrones which form important components of the ecology of these forests. *See* Decl. Ruediger at ¶¶ 63 (explaining the importance of hardwoods as providing food and shelter for wildlife and birds, as well as their drought and beetle resistance), Ex. 1 at 28. In fact, the Decision Record directly respond to these comments by reasserting that hardwoods would be maintained, retained and even promoted under all alternatives. Decl. Darzen, Ex. 3 at 25, 34, 52. The current activities are therefore not within the spectrum of alternatives analyzed, and NEPA supplementation is required.

In sum, the wholesale felling, removal and sale of the hardwood component of these forests in each of the units is a material difference from how the original Ashland SOS project was proposed and analyzed, and supplemental NEPA is required.

**B.    To the extent BLM did authorize this level of hardwood removal, it failed to disclose and take a hard look at the effects of that removal as part of the Ashland SOS EA.**

MEMORANDUM IN SUPPORT - 22

In the alternative, if BLM considered this level of hardwood removal to be part of the project, it was required to analyze and take a "hard look" at the effects of such removal. Failing to do so constituted a failure to "consider an important aspect of the problem." *State Farm*, 463 U.S. at 43. The Supreme Court recently noted that in considering NEPA, the court must afford "substantial deference" to an agency's final determination. *Seven County*, 605 U.S. at 180. However, as the Ninth Circuit recently affirmed, post-*Seven County*, "NEPA [nonetheless] requires the agency to analyze environmental impacts and prepare documents and make such analyses available for public inspection[.]" *Cascadia Wildlands v. U.S. BLM*, 153 F.4th 869, 880 (9th Cir. 2025); *see also Or. Wild v. U.S. Forest Service,* No. 1:22-cv-01007-MC, 2026 U.S. Dist. LEXIS 6263, at *28 (D. Or. Jan. 13, 2026) ("Courts should defer to agencies' decisions about where to draw the line in the scope of an analysis within a broad zone of reasonableness, but only if the analysis presents reasoned determinations consistent with what NEPA mandates the agency must consider.") (internal quotations omitted). For decades, the Ninth Circuit—as well as the Supreme Court—has used a short-hand to describe this requirement: the agency must take a "hard look" at the environmental impacts of its proposed action. *See id.* at 902–03 (citing and applying the "hard look" standard); *see also Idaho Sporting Cong. v. Rittenhouse*, 305 F.3d 957, 963 (9th Cir. 2002) ("hard look" requires consideration of all foreseeable direct, indirect, and cumulative impacts); *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n. 21 (1976) (citing "hard look" standard). While the court "must be at its most deferential" regarding an agency's "predictive or scientific judgments," *Seven County*, 605 U.S. at 181, it "cannot defer to a void," *Or. Nat. Desert Ass'n v. BLM*, 625 F.3d 1092, 1121 (9th Cir. 2008).

Here, Plaintiffs raised the issue of hardwood removal with specificity and examples in several public comments. *See e.g.* Decl. Ruediger, Ex. 1 at 28 ("in recent post-disturbance beetle

salvage projects in the Applegate, the impacts on residual understory growth in the form of established hardwoods, shrubs and understory conifers was nearly complete."), ("large, wide branching hardwoods are often removed or easily damaged during the felling and yarding operations"); Ex. 2 at 30 ("post-disturbance logging will impact natural succession and regeneration, especially of more resilient residual oak, madrone, pine and cedar regeneration"). It was thus reasonably foreseeable that it would occur again in this project. But BLM included no analysis of hardwood removal effects in the EA and the Decision Records' response to comments included this single statement: "the Ashland SOS project proposes to retain healthy living trees, leave snags in proposed units, and promote hardwood species." *See* Decl. Darzen, Ex. 3 at 25, 34, 52 (hardwoods will be retained).

The BLM was put on notice that this was an issue in past sales – both that hardwood retention did not occur and that hardwood removal has effects that needed to be considered, beyond just the effects of salvaging dead and dying conifers. And yet it repeated the refrain (now shown to be false) that hardwood effects would not occur, and failed to conduct any analysis. This is a NEPA violation. *See Rittenhouse*, 305 F.3d at 975.

## V.    An Injunction Is Necessary to Avoid Irreparable Harm.

To satisfy the irreparable harm prong for preliminary relief, plaintiffs must "establish that irreparable harm is likely, not just possible." *Cottrell*, 632 F.3d at 1131 (citing *Winter*, 555 U.S at 22). The Supreme Court has held that "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987). Moreover, "[w]hen a court finds a likelihood of success on the merits of a NEPA claim coupled with likely environmental harm, the NEPA violation generally is found to rise to the level of irreparable

harm supporting preliminary injunctive relief." *W. Watersheds Proj. v. Bernhardt*, 391 F. Supp. 3d 1002, 1022 (D. Or. 2019); *cf. Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961, 970–71 (9th Cir. 2003) (noting the "added risk to the environment that takes place when governmental decisionmakers make up their minds without having before them an analysis (with public comment) of the likely effects of their decision on the environment. NEPA's object is to minimize that risk, the risk of uninformed choice.").

### A.    Plaintiffs Will Suffer Irreparable Harm Absent a Preliminary Injunction.

According to the Supreme Court, "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable." *Amoco Prod. Co.*, 480 U.S. at 545. Moreover, "[w]hen a court finds a likelihood of success on the merits of a NEPA claim coupled with likely environmental harm, the NEPA violation generally is found to rise to the level of irreparable harm supporting preliminary injunctive relief." *W. Watersheds Project,* 391 F. Supp. 3d at 1022 (citations omitted); *cf. Citizens for Better Forestry*, 341 F.3d at 970–71 (noting the "added risk to the environment that takes place when governmental decisionmakers make up their minds without having before them an analysis (with public comment) of the likely effects of their decision on the environment. NEPA's object is to minimize that risk, the risk of uninformed choice."). *See also Cottrell*, 632 F.3d at 1135. Plaintiffs may satisfy the irreparable harm requirement when a project will harm plaintiffs' members' ability to "view, experience, and utilize the areas in their undisturbed state," and will "prevent [their] use and enjoyment . . . of the forest." For the purposes of establishing irreparable harm, "undisturbed" refers to the state of the forest before the challenged activities occur. *See id*.

Here, Plaintiffs demonstrate a likelihood of irreparable harm because Plaintiffs interests are in viewing, experiencing, and recreating in the forests where the Applegate SOS Project is

MEMORANDUM IN SUPPORT - 25

located without the degradation associated with the extensive hardwood logging and removal. *See, e.g.,* Decl. McMillin ¶¶ 6–12 (describing 37 years of residence, use of a spring, and "enjoy[ment] [of] the natural beauty of the forests now targeted for logging in the Apple Sas Timber Sale" that will be impacted by loss of hardwoods); Decl. Paule ¶¶ 6 (Holcomb Hollow "extends all the way to my property line . . . [b]ased on the current 'leave' tree marks, the mature, green, fire- and beetle-resistant forest we walk through daily will be reduced to a handful of trees per acre. . ."), 13 (describing importance of mixed hardwoods to East Applegate Ridge Trail); Decl. Pierce, ¶¶ 6–7, 10 (describing frequent use of areas within Apple Saws near his property, and impacts of extensive hardwood removal); Decl. Shockey, ¶¶ 20–24 (describing interest in rare species, importance of hardwoods), 31–34; Decl. Ruediger, ¶¶ 24–26, 44, 91–93; *see Cottrell*, 632 F.3d at 1135 (noting post-fire logging of 1,652 acres and plaintiffs' members harm of inability to "view, experience, and utilize" the area.); *see also Env't. Prot. Info. Ctr. ("EPIC") v. Carlson*, 968 F.3d 985, 991 (9th Cir. 2020) (recently holding that post-fire roadside logging is irreparable harm).

Once the hardwood trees, including mature madrones, are cut and removed, the harm is long-lasting if not permanent. *League of Wilderness Defenders/Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 764–65 (9th Cir. 2014) ("The logging of mature trees, if indeed incorrect in law, cannot be remedied easily if at all. Neither the planting of new seedlings nor the paying of money damages can normally remedy such damage."). Absent preliminary relief from this court, Plaintiffs and their members will suffer irreparable harm from the loss of these trees and harm to the wildlife that utilize them. *See, e.g.,* Decl. McMillin, ¶ 17; Decl. Paule ¶¶ 15–16; Decl. Pierce, ¶¶ 20–21; Decl. Shockey, ¶¶ 30–34; Decl. Ruediger, ¶¶ 18, 63.

**B.      Implementation of the Project Prior to Fulfillment of Defendants' Duties Under NEPA Would Cause Irreparable Procedural Harm to Plaintiffs.**

MEMORANDUM IN SUPPORT - 26

Defendants have unlawfully failed to fulfill their procedural obligations under NEPA by changing the Project to allow the extensive removal and sale of hardwoods without disclosing and analyzing the effects of those activities. Hardwood cutting and removal has been extensive and on-going for more than a month. *See, e.g.,* Decl. McMillin, ¶ 12; Decl. Pierce ¶ 20; Decl. Ruediger 59–71. For purposes of preliminary relief, "[t]he NEPA duty is more than a technicality; it is an extremely important statutory requirement to serve the public and the agency *before* major federal actions occur. If plaintiffs succeed on the merits, then the lack of an adequate environmental consideration looms as a serious, immediate, and irreparable injury." *W. Watersheds Proj.*, 391 F. Supp. 3d at 1022 (citations and internal marks omitted). Procedural harms, when paired with irreparable environmental harms, result in irreparable procedural injury. *Cf. Save Strawberry Canyon v. Dep't of Energy*, 613 F. Supp. 2d 1177, 1187 (N.D. Cal. 2019) ("The procedural injury is also irreparable" and "imminent" given "the project will soon break ground, including clearing out acres of trees. . .").

Plaintiffs have articulated procedural harms resulting from Defendants' implementation of the Ashland SOS project without supplementing the NEPA analysis. At the scoping stage, Plaintiffs submitted comments raising alarm about impacts to hardwoods. Decl. Ruediger Ex. 1 at 28. Defendants responded to those comments with assurances that hardwoods would be retained. *See* Decl. Darzen, Ex. 3 at 25, 34, 52. Plaintiffs have continued to inform BLM about on-going implementation violations, including the extensive and unauthorized logging of hardwoods, and have requested BLM either enforce the approved project or conduct further NEPA. Decl. Ruediger ¶¶ 65. 79, 89, Exs. 4-6. BLM has at times acknowledged the discrepancies, while mostly dismissing Plaintiffs concerns and restating boilerplate language about hardwood retention except for operational safety. Decl. Ruediger ¶¶ 72–88; Decl. Darzen,

MEMORANDUM IN SUPPORT - 27

Ex. 10.

The absence of proper process, paired with the permanent environmental harm of logging that will result from the unanalyzed and unauthorized hardwood removal, will result in irreversible procedural harms to Plaintiffs and their members in the absence of preliminary relief. *W. Watersheds Proj. v. Zinke*, 336 F. Supp. 3d 1204, 1241 (D. Idaho 2018) ("an incomplete observance of environmental laws and procedure (through abbreviated NEPA reviews and less complete public comments or none at all), aided by agency inertia, combine to create irreparable harm."). In such instances, "to set aside the agency's action at a later date will not necessarily undo the harm," because the agency and private parties will have committed to the action, and a new NEPA analysis "may bring about a *new* decision, but it is that much less likely to bring about a *different* one." *Sierra Club v. Marsh*, 872 F.2d 497, 500 (1st Cir. 1989) (Breyer, J.). The irreparable harm to Plaintiffs, coupled with the Forest Service's NEPA violation, weigh in favor of an injunction.

Plaintiffs meet this *Winter* factor.

## IV.    The Balance of Hardships and Public Interest Favor an Injunction.

When the government is a party, the last two *Winter* factors—balance of the equities and public interest—merge. *EPIC*, 968 F.3d at 991. There is a "well-established public interest in preserving nature and avoiding irreparable environmental injury." *Cottrell*, 632 F.3d at 1138. Thus, if irreparable environmental injury is sufficiently likely, the balance of harms usually will favor the issuance of an injunction to protect the environment. *EPIC*, 968 F.3d at 991 (citing *Amoco Prod. Co.*, 480 U.S. at 545). Moreover, when the alleged action by the government violates federal law, the public interest factor weighs in favor of the plaintiff. *W. Watersheds Proj.t*, 391 F. Supp. 3d at 1026 (citing *Valle del Sol, Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013)).

MEMORANDUM IN SUPPORT - 28

The balance of equities favors injunctive relief here because of the irreparable environmental injury and the public interest in the government's compliance with the applicable law. While the Defendants have justified the purpose of the SOS Project in terms of salvage and fire mitigation, the narrow scope of Plaintiffs' requested Preliminary Injunction ensures that those activities targeted only at dead and dying trees, which were analyzed in the original EA, can move forward even with the injunction in place. On the flip side, to avoid a preliminary injunction, Defendants must demonstrate that the specific activities sought to be enjoined— intensive, unanalyzed hardwood logging operations—are so essential that such operations outweigh all other interests. *See Sierra Forest Legacy v. Rey*, 577 F.3d 1015, 1022 (9th Cir. 2009) ("When deciding whether to issue a narrowly tailored injunction, district courts must assess the harms pertaining to injunctive relief in the context of that narrow injunction."). Defendants cannot make that showing, particularly given that Defendants have acknowledged the excessive removal of hardwoods, *see, e.g.,* Decl. Ruediger ¶ 80, and have acknowledged the importance of hardwoods to regional ecology, Decl. Darzen, Ex. 1 at 127.

On the balance of harms inquiry, the question is whether the Forest Service's need to conduct such activities **during the pendency of this litigation**. Without any evidence that implementing hardwood logging in the sale areas must occur prior to completion of supplemental NEPA analysis, the balance of harms does not weigh in the Forest Service's favor. The public's interest in ensuring that federal agencies manage public lands in compliance with environmental laws "invokes a public interest of the highest order: the interest in having government officials act in accordance with the law." *Seattle Audubon Soc'y v. Evans*, 771 F. Supp. 1081, 1096 (W.D. Wash. 1991).

Finally, procedural NEPA violations can and do warrant preliminary relief. *See Cottrell*,

MEMORANDUM IN SUPPORT - 29

632 F.3d at 1137–38 (balancing the equities in favor of plaintiff where the plaintiff presented serious questions on the merits of its claim that the Forest Service violated its administrative appeal procedures because plaintiff "was harmed by its inability to participate in the . . . process, and that harm is perpetuated by the Project's approval."). By avoiding the NEPA process in the face of Plaintiffs' ongoing communications about unanalyzed and unauthorized logging, the Forest Service evaded public review and comment on the agency's actions. Indeed, Plaintiffs were only to bring this case because their members were monitoring BLM logging and discovered the extensive removal and sale of hardwoods in contradiction with what was analyzed in the EA (and which they had raised concerns about in comments). *See* Decl. Ruediger ¶¶ 65-67, Figs. 5-8.  Instead, the Forest Service has implemented the Project in a way that exceeds its NEPA review, and without consideration of the environmental impacts of hardwood removal under NEPA. This is contrary to the public interest. *See Cottrell*, 623 F.3d at 1138 (recognizing that "careful consideration of environmental impacts *before* major federal projects go forward . . . comports with the public interest); *accord S. Fork Band Council of W. Shoshone of Nev. v. U.S. Dep't of Interior*, 588 F.3d 718, 728 (9th Cir. 2009) (holding that issuance of an injunction pending consideration of environmental impacts under NEPA comported with the public interest).

## V.      Scope of Injunction

District courts enjoy "considerable discretion in fashioning suitable relief and defining the terms of an injunction," but "injunctive relief must be tailored to remedy the specific harm alleged." *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1195 (9th Cir. 2024). Here, Plaintiffs have alleged environmental injury from the commercial logging of hardwood trees as well as procedural harms from the failure to comply with NEPA's requirements. This court should enjoin BLM from proceeding with any logging that results in the

MEMORANDUM IN SUPPORT - 30

felling and removal of hardwoods until a decision issues on the merits.

## VI.    No Bond Should Be Required

Federal Rule of Civil Procedure 65(c) ordinarily requires that a party moving for a preliminary injunction provide a security in an amount determined by the court "to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." The Ninth Circuit, however, has long held that courts have discretion to dispense with the requirement "where requiring security would effectively deny access to judicial review." *People of State of Cal. ex rel. Van De Kamp v. Tahoe Reg'l Plan. Agency*, 766 F.2d 1319, 1325 (9th Cir. 1985), *amended*, 775 F.2d 998 (9th Cir. 1985). A finding that the plaintiff is likely to succeed on the merits also "tips in favor of a minimal bond or no bond at all." *Id.* at 1326. "Moreover, special precautions to ensure access to the courts must be taken where Congress has provided for private enforcement of a statute." *Id.* at 1325–26 (citing *Friends of the Earth, Inc. v. Brinegar*, 518 F.2d 322, 323 (9th Cir. 1975)).

No bond should be required here because it "is well established that in public interest environmental cases the plaintiff need not post bonds because of the potential chilling effect on litigation to protect the environment and the public interest." *Cent. Or. Landwatch v. Connaughton*, 905 F. Supp. 2d 1192, 1198 (D. Or. 2012). "Federal courts have consistently waived the bond requirement in public interest environmental litigation, or required only a nominal bond." *Id.*; *see also Forestkeeper v. USFS*, No. 1:21-cv-01041-DAD-BAM, 2021 U.S. Dist. LEXIS 192443 (E.D. Cal. Oct. 5, 2021) (no additional bond beyond previously ordered $100 bond considering no realistic harm to defendant and public interest nature); *Wildlands v. Warnack*, 570 F. Supp. 3d 983, 993 (D. Or. 2021) (no bond on account of "chilling effect"); *cf. E. Bay Sanctuary Covenant v. Trump*, 349 F. Supp. 3d 838, 868–69 (N.D. Cal. 2018), *aff'd*, 950 F.3d 1242 (9th Cir. 2020) (waiving bond).

MEMORANDUM IN SUPPORT - 31

Plaintiffs are each environmental interest non-profit organizations with limited resources; imposition of a bond would have a "chilling effect." *Cent. Or. Landwatch*, 905 F. Supp. 2d at 1198; Decl. Ruediger, ¶¶ 94-95.

## CONCLUSION

For all of the foregoing reasons, Plaintiffs respectfully ask this Court to grant their Motion for Preliminary Injunction.

DATED this 22nd day of April, 2026.

Respectfully submitted,

/s/ Meriel L. Darzen
Meriel L. Darzen (OSB #113645)
Kelsey Dunn (OSB #244709)
Crag Law Center
3141 E. Burnside Street
Portland, Oregon 97214
Tel: 503-525-2725
Email: meriel@crag.org

*Attorneys for Plaintiffs*

MEMORANDUM IN SUPPORT - 32

## TABLE OF EXHIBITS (DARZEN DECLARATION)

| Ex. | *Author* / TITLE |
|---|---|
| 1 | *BLM*, Final Ashland SOS Environmental Assessment |
| 2 | *BLM,* Ashland SOS Project Finding of No Significant Impact |
| 3 | *BLM,* Ashland SOS Decision Record #1 |
| 4 | *BLM,* Ashland SOS Decision Record #2 |
| 5 | *BLM,* Ashland SOS Decision Record #3 |
| 6 | *BLM,* Ashland SOS Decision Record #4 |
| 7 | *United States Fish and Wildlife Service,* Ashland SOS Project Biological Opinion |
| 8 | Letter from Crag Law Center to Lauren Brown, BLM – Feb. 26, 2026 |
| 9 | Email from Lauren Brown to Crag Law Center, March 2, 2026 |
| 10 | Emails between Crag Law Center and U.S. DOJ |

MEMORANDUM IN SUPPORT - 33