IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MEDFORD DIVISION

APPLEGATE SISKIYOU ALLIANCE
and KLAMATH FOREST ALLIANCE,

           Plaintiffs,

      v.

UNITED STATES BUREAU OF
LAND MANAGEMENT,

           Defendant.

Case No. 1:26-cv-00409-MC

OPINION AND ORDER

MCSHANE, Judge:

Plaintiffs Applegate Siskiyou Alliance and Klamath Forest Alliance move to enjoin the Ashland SOS Project until Defendant Bureau of Land Management ("BLM") takes a "hard look" at the effects of hardwood logging. Pls.' Mot. for Prelim. Inj. 2, ECF No. 9.

Because Plaintiffs fail to demonstrate likelihood of success on the merits, their request for preliminary injunctive relief is **DENIED**.

## BACKGROUND

Southwest Oregon is experiencing a high rate of conifer tree mortality. *Id.* 6–7; Def.'s Resp. in Opp'n 3, ECF No. 18 (citing, *e.g.*, AR 1461–2, 1467 (Ashland SOS Project Final Environmental Assessment ("EA"), at 1–2, 7)).[1] Past vegetation management and infrequent low-

---

[1] This memorandum cites to BLM's Administrative Record as "AR [Bates stamp number only]." BLM filed the AR with the Court on May 13, 2026, via flash drive. *See* ECF No. 17.

1 – Opinion & Order

to-moderate forest fires have created unnaturally dense forest conditions. AR 1462. Such density intensifies competition for water, heightens susceptibility to deadly infestations, and increases the likelihood of severe forest fires. *Id.*

Douglas fir trees are particularly vulnerable to drought conditions, as well as the flatheaded fir borer, an insect native to Southwest Oregon. *Id.* The parties agree that more Douglas firs died in Southwest Oregon between 2015 and 2019 than in the preceding forty years. *Id.* 1462–63; Pls.' Mot. for Prelim. Inj. 7; Def.'s Resp. in Opp'n 3.

Defendant BLM designed the Ashland SOS Project to reduce the risk of severe forest fires by removing dead and dying conifers near several communities in Southwest Oregon. AR 1462–65. Beyond increasing fuel load in dense parcels, dead and dying conifers may fall on roads, cars, and people. *Id.* 1463. BLM targeted removal within one mile of residences, along emergency response roads, and on "prominent public travel routes." *Id.* 1467.

The Ashland SOS draft Environmental Assessment ("EA") opened for public comment between May 23, 2025, and June 23, 2025. *E.g., id.* 1800 (Ashland SOS Decision Record 1, at 5). Plaintiffs Applegate Siskiyou Alliance and Klamath Forest Alliance submitted comments on the Project's scope and on the EA. *See* Ruediger Decl. Exs. 1–2, ECF No. 11.

On September 11, 2025, BLM issued the final EA for the Ashland SOS Project. Pls.' Mot. for Prelim. Inj. 11; AR 1461. That same day, the agency published a Finding of No Significant Impact ("FONSI"), which stated BLM would not issue an Environmental Impact Statement ("EIS") for the Project. Pls.' Mot. for Prelim. Inj. 11; AR 1786–87 (Ashland SOS Project FONSI, at 1–2).

The final EA scopes the Ashland SOS Project as the removal or salvage of "dead and dying conifers to enhance safety for the public and fire personnel by addressing the high levels of

hazardous fuel accumulations." AR 1468. BLM states the Project is not aimed at removing the area's non-conifer trees, such as California black oaks, pacific madrones, and canyon live oaks. *Id.* 1471, 1579; Def.'s Resp. in Opp'n 5.

To offset the cost of removing dead and dying conifers in service of the Project, BLM held timber sales. AR 1464. During logging operations, the EA prescribes retention of "all" healthy trees and hardwoods over 24 inches in diameter "unless removal is required for safety and operational purposes." *Id.* 1471. Appendix F of the EA adds, "hardwoods over 8 inches [in diameter]" are not to be cut "unless necessary for safety or operational purposes." *Id.* 1682.

In the EA, BLM analyzed environmental effects of its proposed salvage activities "across treatment units" and "at the stand level." Def.'s Resp. in Opp'n 5. The agency "did not focus on particular trees" in considering the Project's impact on wildlife habitats, soil quality, recreation activities, and potential fire activity. *Id.* 6.

After finalizing the EA, BLM issued four total Decision Records ("DRs") authorizing commercial salvage harvest and hazard tree operations in the Ashland SOS area. AR 779–836, 1796–1969 (DRs 1–4). Two of the four contracts—Apple Saws and Holcomb Hollow—are in the implementation phase. Brown Decl. ¶ 4, ECF No. 18-1; Def.'s Resp. in Opp'n 6. During implementation, BLM maintains general oversight over tree removal operations, but does not "second-guess the safety determinations made by operators" during logging. Brown Decl. ¶ 8.

Since January 1, 2026, Plaintiffs' members have monitored logging operations and communicated with BLM about the Project's execution, specifically concerning the removal and sale of hardwood trees. *E.g.,* Ruediger Decl. ¶¶ 59–89, Figs. 4–7, Exs. 4–7. On March 3, 2026, Plaintiffs brought this action challenging BLM's approval of the Ashland SOS Project under the Federal Land Policy and Management Act and the National Environmental Policy Act ("NEPA").

3 – Opinion & Order

Compl. ¶ 5, ECF No. 1.

Before the Court is Plaintiffs' Motion for Preliminary Injunction focusing only on whether BLM violated NEPA by failing to sufficiently analyze the environmental effects of logging hardwoods. Pls.' Mot. for Prelim. Inj. 2. On June 25, 2026, the Court heard oral argument on Plaintiffs' Motion. ECF No. 26. That day, the Court ordered supplemental briefing on whether Defendant BLM took the required "hard look" at non-conifer tree removal in the Project's EA. ECF No. 27.

## LEGAL STANDARDS

### I.     Standards for a preliminary injunction

To obtain a preliminary injunction, plaintiffs must clearly establish (1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm without injunctive relief, (3) the balance of equities is in their favor, and (4) the injunction would serve the public interest. *E.g., Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20, 22 (2008).

In the Ninth Circuit, if a plaintiff raises "serious questions going to the merits" and shows "a hardship balance that tips sharply" in his favor, a preliminary injunction may be appropriate. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011) (holding "serious questions going to the merits" and "a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met."). "Serious questions" are "'substantial, difficult and doubtful,'" requiring "more deliberative investigation." *Republic of the Phil. v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988) (quoting *Hamilton Watch Co. v. Benrus Watch Co.*, 206 F.2d 738, 740 (2d Cir. 1952)).

### II.    Standards of review under NEPA and the APA

#### a.  NEPA

NEPA ensures agencies consider significant environmental impacts of their proposed actions. *E.g., Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Eng'rs*, 524 F.3d 938, 947 (9th Cir. 2008). Under the statute, an agency must inform the public that it has incorporated environmental concerns in its decision-making. *Id.* A purely procedural mandate, NEPA "imposes no substantive environmental obligations or restrictions" on agency action. *Seven Cnty. Infrastructure Coal. v. Eagle Cnty., Colo.*, 605 U.S. 168, 173 (2025). NEPA permits agencies to weigh environmental consequences as they reasonably see fit under their governing statutes and relevant substantive environmental laws. *Id.* "NEPA does not require the agency to prioritize environmental concerns over other concerns in determining whether to proceed with a project." *Cascadia Wildlands v. U.S. Bureau of Land Mgmt.*, 153 F.4th 869, 880 (9th Cir. 2025).

Courts reviewing agency actions under NEPA evaluate whether an agency took the required "hard look" at the environmental effects of the proposed action. *E.g., Cascadia Wildlands v. Bureau of Land Mgmt.*, 410 F. Supp.3d 1146, 1156 (D. Or. 2019) (citing *Bering Strait Citizens*, 524 F.3d at 947). An agency's "hard look" starts with an EA to determine if an action will have significant environmental consequences and thus whether an EIS is required. *Id.* (citing *Conner v. Burford*, 848 F.2d 1441, 1446 (9th Cir. 1988)); *see also* 42 U.S.C. § 4336(b)(2). In preparing an EA, agencies must consider "all foreseeable direct and indirect impacts" of the proposed action. *Cascadia Wildlands*, 410 F. Supp.3d at 1156–57 (quoting *Ctr. for Biological Diversity v. Salazar*, 695 F.3d 893, 916–17 (9th Cir. 2012)).

### b. APA

The Administrative Procedure Act ("APA") governs judicial review of agency decisions under NEPA. *E.g., Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 871 (9th Cir. 2022) (citing *Pit River Tribe v. U.S. Forest Serv.*, 469 F.3d 768, 778 (9th Cir. 2006)). Courts

consider whether agencies complied with NEPA using the APA's deferential arbitrary and capricious standard. *Id.*; *Seven Cnty. Infrastructure Coal.*, 605 U.S. at 180 ("Under that standard, a court asks not whether it agrees with the agency decision, but rather only whether the agency action was reasonable and reasonably explained.").

An agency action is arbitrary and capricious "only if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency." *Env. Def. Ctr.*, 36 F.4th at 871 (quoting *Defs. of Wildlife v. Zinke*, 856 F.3d 1248, 1257 (9th Cir. 2017)). A court will "set aside" any agency decision found to be arbitrary and capricious. 5 U.S.C. § 706(2)(A).

**DISCUSSION**

### I.    <u>Plaintiffs have standing</u>

Though BLM does not raise a standing challenge, the Court must ensure standing exists. *E.g.*, *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009). Plaintiffs are 501(c)(3) environmental organizations whose members use and enjoy the public lands at issue. *E.g.*, Ruediger Decl. ¶¶ 3–9 (explaining Plaintiff organizations' structures and missions); McMillin Decl. ¶¶ 3–9, ECF No. 12 (detailing individual member's relationship to Plaintiff organization and her use of the public lands in the Ashland SOS area).

To seek injunctive relief, plaintiffs must demonstrate: (1) "concrete and particularized" injury that is not conjectural or hypothetical, and is "fairly traceable" to the conduct at issue; and (2) a "favorable judicial decision" will "redress the injury." *Summers*, 555 U.S. at 493 (citing *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000)).

An association has standing to sue on behalf of its members when: "[1] its members would otherwise have standing to sue in their own right, [2] the interests at stake are germane to the

organization's purpose, and [3] neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Laidlaw*, 528 U.S. at 181 (citing *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)).

First, the Court finds Plaintiffs satisfy the second two requirements of the *Hunt* test. Plaintiffs' efforts to challenge allegedly harmful removal of hardwood trees is undoubtedly germane to their purposes of promoting the well-being and protection of lands in the Project area. *Cf. Hunt*, 432 U.S. at 344 (concluding the Commission's attempt to secure the apple growing industry's right to publicize its grading system is pertinent to its purpose of furthering the market for Washington apples); *see* Ruediger Decl. ¶¶ 3–9.

Further, injunctive relief can be resolved in a group context since it does not depend on participation of Plaintiffs' individual members. *E.g.*, *Warth v. Seldin*, 422 U.S. 490, 511 (1975) (stating as long as "the relief sought does not make the individual participation of each injured party indispensable to proper resolution of the cause," an association may have standing to sue on behalf of its members).

This Court also concludes the first requirement of the *Hunt* test—Plaintiffs' members would have standing to sue in their own right—is met. "In environmental cases, the injury-in-fact analysis for standing often centers on whether the plaintiff environmental organization, through its members, has a sufficient connection to an area that is alleged to suffer harm" by the challenged conduct. *Or. Wild v. U.S. Forest Serv.*, 819 F. Supp.3d 1185, 1197 (D. Or. 2026) (McShane, J.) (citing *Summers*, 555 U.S. at 493–96; *Laidlaw*, 528 U.S. at 183–86).

Plaintiffs can establish injury-in-fact through sworn statements showing the challenged activity will degrade the "aesthetic and recreational values of the area." *Laidlaw*, 528 U.S. at 183 (quoting *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972)); *Ecological Rts. Found. v. Pac. Lumber*

*Co.*, 230 F.3d 1141, 1149 (9th Cir. 2000) (stating an environmental plaintiff can show injury-in-fact through (1) repeated recreational use of an area, "even if relatively infrequent," and (2) "a credible allegation of desired future use.").

Here, Plaintiffs' members have a strong connection to the Ashland SOS Project area. For instance, Applegate Siskiyou Alliance member Shelly McMillin's property adjoins BLM land impacted by the Apple Saws Timber sale. McMillin Decl. ¶ 5. She has spent thirty-seven years recreating in the Apple Saws Timber sale area and alleges the Ashland SOS Project has already "irreparably harmed" her ability to enjoy the land. *Id.* ¶ 6. She also avers activity associated with the timber sale, including "extensive" hardwood tree removal, threatens the quality of water from the spring on her homestead. *Id.* ¶¶ 9, 11.

Another member, Martin Paule, owns land abutting a unit of the Holcomb Hollow Timber sale. Paule Decl. ¶ 6, ECF No. 13. He declares the approved timber sales "will profoundly and negatively impact the viewshed" he presently enjoys because nearby stands "will be reduced to a handful of trees per acre." *Id.* Plaintiffs have established that their members live near and use the affected areas. And for the purposes of standing, Plaintiffs have shown the challenged activities degrade, at a minimum, the aesthetic and recreational values of those areas for their members.

Beyond injury-in-fact, Plaintiffs contend BLM's approval of the Project is responsible for their injuries and an injunction from this Court would redress their alleged harm. Pls.' Mot. for Prelim. Inj. 16–17. The Court is satisfied that Plaintiffs have standing to bring this action.

II.     **Plaintiffs fail to demonstrate the requirements for injunctive relief**

a.  **Plaintiffs do not show requisite likelihood of success on the merits**

i.  **BLM is not required to supplement its EA**

The first question is whether Plaintiffs have shown a likelihood of success on the merits as

to whether BLM's actions violate NEPA. Plaintiffs contend BLM must supplement the Ashland SOS Project's EA because the Project has substantially changed due to of the "felling, removal[,] and sale of large quantities of hardwoods." Pls.' Mot. for Prelim. Inj. 18–19. Plaintiffs allege up to 80% of hardwoods have been removed in some units since BLM began implementing the Project. *Id.* 19 (citing Ruediger Decl. ¶ 63).

Because the Project requires logging companies to retain "all hardwood species unless removal is required for safety or operational reasons," Plaintiffs argue the scope of hardwood removal triggers BLM's obligation to supplement the EA to account for the differences between the Project as planned and the Project as implemented. *Id.* 21–22. In response, Defendant submits that the monitoring and enforcement of the Project's lumber sale contracts do not constitute major federal actions governed by NEPA. Def.'s Resp. in Opp'n 12.

NEPA ensures an agency refrains from making major environmental decisions using "incomplete information, only to regret its decision after it is too late to correct." *Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 557 (9th Cir. 2000) (quoting *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 371 (1989)). "If there remains major Federal action to occur" and the agency obtains new information about the environmental impact of its proposed action, a supplemental EIS or EA may be required. *Marsh*, 490 U.S. at 374.

Yet NEPA does not mandate agencies supplement an EIS or EA "every time new information comes to light after the EIS is finalized." *Marsh*, 490 U.S. at 373. In *Marsh v. Oregon Natural Resources Council*, the Supreme Court considered whether NEPA required the Army Corps of Engineers to supplement its initial EIS analyzing the environmental impact of the Elk Creek Dam. *Id.* at 368. The Court concluded the agency must supplement if the remaining major federal action—the construction of the Dam—would significantly "affect the quality of the human

environment" in a way the Corps had not considered. *Id.* at 373–74; *see id.* at 385 (stating the Corps would have been required to prepare a second supplemental EIS had the information at issue been "both new and accurate," but since it was not, the agency acted within its authority in declining to supplement) .

In contrast, in *Norton v. Southern Utah Wilderness Alliance* ("*SUWA*"), evidence of increased off-road vehicle use did not obligate BLM to supplement its environmental analysis because there was no major outstanding federal action. 542 U.S. 55, 73 (2004). The initial *approval* of the land use plan was the major federal action. *Id.* The Court contrasted *SUWA* with its finding in *Marsh* that the dam construction project giving rise to environmental review was "not yet completed." *Id.*

The Court likens the instant case to *SUWA*. There, the major federal action within the meaning of the statute was the approval of the project itself. The same is the case here with the Ashland SOS Project. The Court disagrees with Plaintiffs that BLM oversight of timber sale operations constitutes major federal action for the purposes of challenging the EA under NEPA. Pls.' Mot. for Prelim. Inj. 21–22; *Ctr. for Biological Diversity v. Salazar*, 706 F.3d 1085, 1095 (9th Cir. 2013) ("[B]ecause the [1988 plan of operations] . . . has been approved, [BLM's] obligation under NEPA has been fulfilled.") (quoting *Cold Mountain v. Garber*, 375 F.3d 884, 894 (9th Cir. 2004)).

The salient question here is whether BLM complied with NEPA in the initial crafting of the Project's EA. *See Or. Nat. Res. Council Action v. U.S. Forest Serv.*, 445 F. Supp. 2d 1211, 1222 (D. Or. 2006) (explaining courts, in enjoining projects for NEPA violations, have implicitly found there remains major federal action to occur until the agency complies with NEPA).

### ii. BLM took the required "hard look" at the effects of hardwood tree removal in the EA

10 – Opinion & Order

Plaintiffs raised the issue of incidental hardwood removal in several public comments. Pls.' Mot. for Prelim. Inj. 23–24 (citing Ruediger Decl., Ex. 1, at 28, Ex. 2, at 30). Plaintiffs aver BLM nevertheless "included no analysis of hardwood removal effects in the EA" in violation of NEPA. *Id.* 24. They argue "[h]ere, BLM knew that hardwood trees would be cut as part of this project and was therefore required to consider the foreseeable impacts of the hardwood removal." Pls.' Suppl. Br. 3, ECF No. 31. Plaintiffs also observe BLM's response to their concerns about cutting hardwoods: "The Ashland SOS [P]roject proposes to retain healthy living trees, leave snags in proposed units, and promote hardwood species." Pls.' Mot. for Prelim. Inj. 24 (quoting AR 1820).

BLM contends it "gathered information about the makeup of the stands" and "compared estimated pre- and post-treatment conditions." Def.'s Suppl. Br. 5, ECF No. 30. In the planning phase, BLM "characterized existing stand conditions," proposed "silvicultural prescriptions," and "marked for retention" reserve trees, including "large legacy hardwoods." *Id.* 5–6 (citing Second Brown Decl. ¶¶ 10–11, ECF No. 30-1). BLM concedes the Ashland SOS Project contemplates hardwood removal, but asserts they accounted for it in the EA. *Id.* 5. Specifically, they focus here on the fact it fulfilled its NEPA obligations by estimating "post-treatment conditions"—including the presence of some hardwoods and the removal of others—relevant to the environmental issues analyzed in the EA. *Id.* 9.

BLM argues the timber sales are occurring in a manner contemplated by the EA, obviating the need for further impact analysis. Def.'s Resp. in Opp'n 16–17. BLM maintains the removal of hardwoods, "as necessary for safety or operational purposes, is consistent with the design of the project." *Id.* 17 (citing Brown Decl. ¶¶ 15–17). The parties ultimately concur hardwoods are being removed in the challenged timber sales. *Id.* 18. But they disagree about the extent of such removal and, relevant here, whether it exceeds the scope of the EA. *Id.*

11 – Opinion & Order

Agencies must "'undertake a full and fair analysis of the environmental impacts of their activities,'" including taking a "hard look" at environmental consequences. *Cascadia Wildlands*, 153 F.4th at 902 (quoting *350 Mont. v. Haaland*, 50 F.4th 1254, 1265 (9th Cir. 2022)). Taking a "hard look" calls for an agency to "provide 'a reasonably thorough discussion of the significant aspects of the probable environmental consequences'" of its proposed action. *350 Mont.*, 50 F.4th at 1265 (quoting *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1194 (9th Cir. 2008)).

Probable environmental consequences include cumulative impacts—those resulting "from individually minor but collectively significant actions taking place over a period of time." *Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 993 (9th Cir. 2004) (quoting 40 C.F.R. § 1508.7). To properly consider cumulative impacts pursuant to NEPA, an agency must provide "some quantified or detailed information." *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1379 (9th Cir. 1998).

The scope of review for whether BLM took a "hard look" at environmental consequences in the EA is narrow. *E.g., Cascadia Wildlands*, 153 F.4th at 892. A court should "not micromanage" agency choices provided "they fall within a broad zone of reasonableness." *Seven Cnty. Infrastructure Coal.*, 605 U.S. at 169. Courts "review the BLM's compliance with NEPA under the deferential 'arbitrary and capricious' standard of the [APA]." *Cascadia Wildlands*, 153 F.4th at 902 (quoting *Ctr. for Biological Diversity v. U.S. Dep't of the Interior*, 623 F.3d 633, 641 (9th Cir. 2010) (quoting 5 U.S.C. § 706(2)(A)).

The Court is satisfied the agency took a "hard look" at the environmental consequences of hardwood tree removal within the meaning of NEPA. BLM prepared "Tree Tally" sheets to document the predicted "post-treatment stand conditions" for each timber harvest unit. Def.'s

Suppl. Br. 6 (citing Second Brown Decl. ¶¶ 10–11, AR 2306–47 (Holcomb Hollow Tree Tally), 2348–78 (Thom Bone Tree Tally), 2379–417 (Chopper Styx Tree Tally), 2418–60 (Apple Saws Tree Tally)). The Tree Tallies, completed over several months, identify trees marked for retention by species (such as madrone and cedar) and diameter class. *Id.* (citing Second Brown Decl. ¶ 10, AR 2306). Accordingly, the Tallies estimate "the makeup of the stands post-treatment," including trees per acre, basal area, canopy cover, and snag retention. *Id.* (citing Second Brown Decl. ¶¶ 10–11, AR 2306).

BLM explains the Tree Tallies undergirded the analyses in the EA. *Id.* 7 (citing Second Brown Decl. ¶ 12). Specifically, BLM used the Tree Tallies as "inputs for modeling." Second Brown Decl. ¶ 12. In the "hazardous fuels analysis," by way of example, the agency "incorporated hardwood data found in the tally sheets," including number of trees per stand, to model "fire behavior." *Id.* "Northern spotted owl analyses similarly incorporated prescription data validated by the tally sheets." *Id.*

The EA analyzed in detail five major topics: hazardous fuel loading, roadside safety, northern spotted owl habitat, soil productivity and function, and recreation.[2] Second Brown Decl. Table 1, at 1–3 (citing, *e.g.*, AR 1486, 1492, 1493, 1495–500, 1500–13, 1518–28, 1596–602). The agency identifies the relevant pages in the EA and explains how they "incorporate the data regarding hardwood retention [from the Tree Tallies] into BLM's modeling for each of the topics analyzed in detail." Def.'s Suppl. Br. 7 (citing Second Brown Decl. Table 1, at 1–3).

It is true, as Plaintiffs point out, that BLM's refrain of promoting hardwoods failed to illustrate how tree counts in the Tally sheets "factored into any analysis, if they did at all." Pls.' Suppl. Br. 5. But BLM's response to the comments raising such a concern does not necessarily

---

[2] The EA considered many other topics, listed in Appendix E, but did not analyze them in detail. Second Brown Decl. ¶ 13. For those issues, BLM "used the same underlying stand metrics" to predict the Project's effects. *Id.*

mean the agency declined to account for hardwood tree removal in the EA. As BLM explains, it "did not identify 'hardwood removal' as a stand-alone issue because the environmental effects . . . of retaining or removing hardwoods depends on the effects those activities have on particular environmental resources." Second Brown Decl. ¶ 14.

Further, BLM has proffered detailed analyses of the environmental consequences of removing hardwoods, even if the agency did not treat hardwood removal as a stand-alone issue. *E.g.*, AR 1482–83, 1485–86, 2306–47. Conversely, in *North Cascades Conservation Council v. United States Forest Service*, the Ninth Circuit concluded the agency violated NEPA because it "made no effort to analyze the effect of the [project] in its response to comments or objections." 136 F.4th 816, 830–31 (9th Cir. 2025) (finding the agency's explanation that the project was "under assessment to determine the degree to which" fire affected the areas lacked sufficient detail under NEPA). And the court found "no indication" that the Forest Service "had done any work" to estimate or analyze the cumulative impacts of two related, "reasonably foreseeable" timber sales. *Id.* at 830.

In cases where courts have found that BLM took a "hard look" at environmental impacts, the EA being evaluated included a "significant discussion" of the issue. *See, e.g., Leigh v. Raby*, 726 F. Supp.3d 1207, 1222–23 (D. Nev. 2024) (concluding population models estimating annual herd growth rates of wild horses constituted sufficiently detailed information under "hard look."). That BLM did not precisely quantify the impact of hardwood logging is not dispositive, as the record contains "a reasonably thorough discussion of the significant aspects of [its] probable environmental consequences." *Soda Mountain Wilderness Council v. Bureau of Land Mgmt.*, 534 F. App'x 680, 683 (9th Cir. 2013). And "[c]ourts should afford substantial deference" to the agency's "fact-dependent, context-specific, and policy-laden choices" about how it analyzed the

environmental effects in the EA. *Seven Cnty.*, 605 U.S. at 183. The Court will not second-guess BLM's decision to analyze the Project's impact across treatment units and not by specific tree type.

Plaintiffs fail to establish likelihood of success on the merits of their claim that BLM acted arbitrarily and capriciously by failing to take a "hard look" at non-conifer tree removal.

### III. <u>Balancing the equities and considering the public interest, Plaintiffs are not entitled to injunctive relief</u>

Even if Plaintiffs raised serious questions as to whether BLM considered foreseeable hardwood tree removal within the meaning of NEPA, injunctive relief is not appropriate.

Balancing the equities, according to Plaintiffs, centers on whether BLM's need to conduct logging operations during the pendency of this litigation outweighs avoiding "irreparable environmental injury." Pls.' Mot. for Prelim. Inj. 29. Plaintiffs allege the likelihood of irremediable environmental harm and the public's interest in BLM complying with NEPA tip the balance of equities in their favor. *Id.*

BLM contends the Ashland SOS Project "is necessary to reduce fire risk near populated areas." Def.'s Resp. in Opp'n 25 (citing AR 1461–66). "Hazard trees" and increased fuel load in the Project area could threaten life and property. *Id.* (citing AR 1462–63). Enjoining the project "would also cause a loss of revenue to the federal government, as well as local communities" since the contractors must quickly harvest timber while still merchantable. *Id.* 25–26 (citing Brown Decl. ¶¶ 28, 30).

When the government is a party, courts analyze the public interest and balance of equities factors together. *E.g., Env't Prot. Info. Ctr. v. Carlson*, 968 F.3d 985, 991 (9th Cir. 2020). The balance of harms often favors "'the issuance of an injunction to protect the environment'" in cases where "irreparable environmental injury 'is sufficiently likely.'" *Id.* (quoting *Amoco Prod. Co. v.*

*Vill. Of Gambell, AK*, 480 U.S. 531, 545 (1987), *abrogated in part on other grounds by Winter*, 555 U.S. at 20). As for the public interest, courts scrutinize the public interests served by both granting and denying an injunction. *E.g., Cottrell*, 632 F.3d at 1138.

Here, the parties raise competing environmental and economic interests. The Court acknowledges an injunction may hamper BLM's ability to meet is forest management plan—an environmental interest. Def.'s Resp. in Opp'n 26 (citing Brown Decl. ¶ 31). And granting Plaintiffs' request for injunctive relief could negatively impact nearby communities and the logging contractors—an economic interest. *Id.* 26–27 (citing Brown Decl. ¶ 32, Ex. 1, at 1–2).

Further, unlike in some environmental cases, BLM pleads serious environmental and equitable harms resulting from an injunction. Specifically, BLM avers the Project is necessary to decrease the risk of severe, uncontrolled fires in the Ashland SOS area, which could damage personal property and result in loss of life. *Id.* 25 (citing AR 1462–63; Brown Decl. ¶ 27).

The public undoubtedly has a strong interest in "'preserving precious, unreplenishable resources'" and preventing "the unnecessary cutting of trees that would otherwise survive." *Earth Island Inst. v. U.S. Forest Serv.*, 442 F.3d 1147, 1177 (9th Cir. 2006) (quoting *Earth Island Inst. v. U.S. Forest Serv.*, 351 F.3d 1291, 1309 (9th Cir. 2003)). But if the Project were enjoined, the possibility of severe wildfires in the area and increased danger to life, human or wildlife, constitute "measurable injuries." *Wildwest Inst. v. Bull*, 472 F.3d 587, 592 (9th Cir. 2006) (holding the district court did not abuse its discretion in denying an injunction in part due to the possibility of "a severe wildfire in the area" and "inherent danger to human life."). The public has an interest in not experiencing a heightened risk of severe, uncontrolled wildfires. And BLM has an interest in effectively carrying out its forest management plan for the long-term health of the Project area.

The Court finds the balance of equities and public interest weigh in favor of Defendant's

16 – Opinion & Order

continued implementation of the Ashland SOS Project during the pendency of this litigation.

## CONCLUSION

Because Plaintiffs fail to establish likelihood of success on the merits, the Court does not evaluate all four *Winter* factors. *E.g., California v. Azar*, 911 F.3d 558, 575 (9th Cir. 2018) (stating the court "need not consider the other factors" when a movant fails to demonstrate a likelihood of success on the merits).

Plaintiffs' Motion for Preliminary Injunction, ECF No. 9, is **DENIED**.

IT IS SO ORDERED.

DATED this 23rd day of July 2026.

____s/Michael J. McShane_____
Michael McShane
United States District Judge
